**Theodore X. A. SEWELL, Appellant,**

v.

**Paul F. PEGELOW, etc., et al., Appellees.**

**Joseph X. WATSON, Appellant,**

v.

**Paul F. PEGELOW, etc., et al., Appellees.**

**Nos. 8286, 8287.**

United States Court of Appeals
Fourth Circuit.

Argued April 6, 1961.

Decided May 31, 1961.

George Blow, Washington, D. C. (court-assigned counsel), for appellants.

Harvey B. Cohen, Asst. U. S. Atty., Arlington, Va. (Joseph S. Bambacus, U. S. Atty., Richmond, Va., on brief), for appellees.

Before SOBELOFF, Chief Judge, HAYNSWORTH, Circuit Judge, and HARRY E. WATKINS, District Judge.

SOBELOFF, Chief Judge.

Sewell and Watson are inmates of the United States Reformatory at Lorton, Virginia, an institution maintained for prisoners sentenced by the courts of the District of Columbia. They filed complaints in the District Court for the Eastern District of Virginia, which has jurisdiction over the place of their detention, alleging that solely because of their religious beliefs, and for no other

reason, they were isolated and deprived of certain constitutional and statutory rights and discriminatively treated by the superintendent and his assistants. The relief which they prayed was an order restraining and enjoining the officials from continuing the harassment and infringement of their constitutional and civil rights specified in the complaints.

Without requiring the officials to show cause or answer, and without holding a hearing, the District Court dismissed the complaints, stating that it was without jurisdiction to entertain the petition because the matters alleged relate to the discipline and conduct of the internal affairs of the Reformatory, which are exclusively within the authority of the Executive Department.

The two complaints, which closely parallel each other in their essential allegations, may be briefly summarized. They recite that the appellants are Negroes professing Islam and are known as Muslims, but on the appeal they stress that religion, rather than race, was the basis of the claimed discriminations and deprivations. They charge that all the Muslims in the institution, of whom there were thirty-eight at the time, were put in isolation and deprived of institutional privileges, including medical attention. The complainants allege that they violated no disciplinary rules or regulations, and that for no reason other than their religion they were kept for 90 days in isolation in the Disciplinary Control Building, where they were provided only "one teaspoon of food for eating [and] a slice of bread at each meal three times per day." It is further alleged that although the floor of the cell was concrete the complainants were permitted to have a blanket and mattress only between the hours of 10:00 p. m. and 5:30 a. m. This mistreatment, the complaints repeat, was due solely to the hostility entertained by the prison officials toward persons of the Muslim faith. They cite, for example, that they are forbidden to wear medals symbolic of their faith while "that privilege is accorded to Catholics, Baptists, etc."; that unlike prisoners of other faiths, they are denied all opportunity to communicate with their religious advisers, recite their prayers or receive desired publications without fear of being persecuted. Moreover, according to the complainants, their efforts to obtain redress from the Board of Commissioners of the District of Columbia, which has general supervision over the superintendent of the prison, were frustrated by the persistent refusal of the superintendent and other prison officers to transmit any complaints.

■■ It is a rule grounded in necessity and common sense, as well as authority, that the maintenance of discipline in a prison is an executive function with which the judicial branch ordinarily will not interfere. According to the complaints filed we have here, however, no attack upon disciplinary measures taken by the authorities, and no bare conclusory allegation of a denial of constitutional rights. There is an extensive detailed specification of deprivations and hardships inflicted for no infraction of any rule, and solely because of what the appellants describe as their religion. Moreover, it is asserted, and for the purpose of this appeal we must accept as true these and all other assertions of fact in the complaints, that the prison officials have suppressed their letters to the Commissioners of the District of Columbia setting forth their grievances in an effort to obtain relief administratively. In these circumstances the case is manifestly unlike those in which courts have declined to interfere because particular disciplinary measures were taken within the normal management of the institution.[1]

1. See, e. g.: Numer v. Miller, 9 Cir., 1948, 165 F.2d 986; Powell v. Hunter, 10 Cir., 1949, 172 F.2d 330; Stroud v. Swope, 9 Cir., 1951, 187 F.2d 850; Adams v. Ellis, 5 Cir., 1952, 197 F.2d 483; Dayton v. McGranery, 1953, 92 U.S. App.D.C. 24, 201 F.2d 711; Tabor v. Hardwick, 5 Cir., 1955, 224 F.2d 526.

■■ The injunction was sought under the Civil Rights Act of 1871, Rev. Stat. § 1979, 42 U.S.C.A. § 1983. There can be no doubt that a district court has power to grant injunctive relief where there has been a deprivation of civil rights, 28 U.S.C. §§ 1343 and 1651. Moreover, there is no question that the District of Columbia is included in the phrase "any State or Territory" within the meaning of the Act. Talbott v. Board of Com'rs of Silver Bow County, 1891, 139 U.S. 438, 444, 11 S.Ct. 594, 35 L.Ed. 210; Hurd v. Hodge, 1948, 334 U.S. 24, 31, 68 S.Ct. 847, 92 L.Ed. 1187.

■ It is beyond dispute that certain rights and privileges of citizenship are withdrawn from prisoners, but it has never been held that upon entering a prison one is entirely bereft of all of his civil rights and forfeits every protection of the law. On the contrary, it has been held that:

"The fact that plaintiffs are incarcerated in a penitentiary under convictions for felonies, does not deprive them of the right to invoke the provisions of the Civil Rights Act, since that Act applies to any person within the jurisdiction of the United States." Siegel v. Ragen, D.C.N.D.Ill.1949, 88 F.Supp. 996, 998, affirmed 7 Cir., 1950, 180 F.2d 785, certiorari denied 339 U.S. 990, 70 S.Ct. 1015, 94 L.Ed. 139, rehearing denied 1950, 340 U.S. 847, 71 S.Ct. 12, 95 L.Ed. 621.

A recent example of judicial intervention on behalf of prisoners who had been unconstitutionally and unlawfully denied rights, is found in Spires v. Dowd, 7 Cir., 1959, 271 F.2d 659, 661, where it was held that the right to mail legal documents to clerks of courts may not be frustrated. See also: Ex parte Hull, 1941, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034; Dowd v. United States, ex rel. Cook, 1951, 340 U.S. 206, 71 S.Ct. 262, 95 L.Ed. 215.

■ We find it unnecessary to adjudicate here the extent of prisoners' rights, nor do we intimate that each of the separate acts complained of by the plaintiffs would, if proved, constitute a ground for judicial relief. It is sufficient for present purposes to hold, as we do, that the complaints as a whole stated enough to require a hearing. It has been argued to us that if a hearing is ordered in this instance it will encourage a flood of such petitions, but our answer must be the same as that given by the Second Circuit: "We must not play fast and loose with basic constitutional rights in the interest of administrative efficiency." United States ex rel. Marcial v. Fay, 2 Cir., 1957, 247 F.2d 662, 669, certiorari denied 355 U.S. 915, 78 S.Ct. 342, 2 L.Ed.2d 274.

The court expresses its appreciation to Mr. George Blow for his unselfish, able and conscientious performance of his important professional task as court-appointed counsel.

For reasons above stated the order appealed from must be reversed and the case remanded for further proceedings.

Reversed and remanded.