The **FORTUNE SOCIETY**, a non-profit corporation, Roger Champen, and Nathan Wright, on behalf of themselves and all other New York prisoners similarly situated, Plaintiffs,

v.

Paul D. McGINNIS, Commissioner of Correction of the State of New York, John L. Zelker, Superintendent of Green Haven Prison, Stormville, New York, and R. J. Henderson, Acting Superintendent, Eastern New York Correctional Facility, Napanoch, New York, Defendants.

No. 70 Civ. 4370.

United States District Court, S. D. New York.

Nov. 24, 1970.

Louis J. Lefkowitz, Atty. Gen., of New York, New York City, for defendants, Lillian Z. Cohen, Asst. Atty. Gen., of counsel.

Stanley A. Bass, Stephen Shestakofsky, The Fortune Society, New York City, for plaintiffs.

EDWARD WEINFELD, District Judge.

This is an action brought under the Civil Rights Act, 28 U.S.C., section 1343, and 42 U.S.C., section 1983,[1] to protect the right of New York State prisoners to receive Fortune News, a newsletter regularly issued by The Fortune Society, Incorporated.

Plaintiffs are The Fortune Society and two individuals confined to New York State correctional institutions, who sue on behalf of themselves and others similarly situated. The immediate issue is plaintiffs' application for an order pursuant to Rule 65(a) of the Federal Rules of Civil Procedure directing the defendants, the Commissioner of Correction of the State of New York and the respective Superintendents of the institutions where the two individual plaintiffs are presently confined, to cease and desist forthwith from denying them and other New York State prisoners the opportunity to receive Fortune News and to permit New York State prisoners to receive Fortune News to the same extent they are permitted to receive other publications.

The facts do not appear in dispute. The Fortune Society, Incorporated is a non-profit membership corporation registered as a charitable organization with the New York State Department of Social Services, and is a federally tax exempt organization,[2] which is maintained by contributions from various sources. Its primary purpose is to create a greater public awareness of the prison system in America today. The organization sends out teams of speakers, ex-convicts, who talk to school, church, business and civic groups and also appear on radio and television. The speakers seek to relate their firsthand experience of prison life and to foster a greater awareness of the causes of crime. The organization also seeks to assist ex-convicts, current inmates, and the families of both, by providing counselling, clothing, non-perishable foods, job referrals and other services. The Fortune Store is operated by the organization to provide employment for ex-convicts and as an outlet for ex-convict produced goods and crafts.

The Society publishes a monthly newsletter. The Fortune News, which contains articles and information on prison reform, ex-convicts' rehabilitation and the activities of the organization. This newsletter is widely distributed and is read by inmates in many penal institutions throughout the country. According to the latest issue of the Fortune News, October 1970, it had 3,783 paying sponsors and 10,864 names on its mailing list. The organization, according to an undisputed affidavit, has worked with governmental agencies and legislative bodies other than the New York State Department of Correction and is acknowledged to be a responsible representative of ex-inmate opinion and ideas. Its representatives have testified before federal and state legislative bodies and have assisted in the training of federal,

1. Federal jurisdiction is properly invoked. See Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968); McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); Sostre v. McGinnis, 334 F.2d 906 (2d Cir.), cert. denied, 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96 (1964); Pierce v. La Vallee, 293 F.2d 233, 235–236 (2d Cir. 1961); Carothers v. Follette, 314 F.Supp. 1014, 1018 (S.D.N.Y.1970).

2. Internal Revenue Code, 26 U.S.C. § 501 (c) (3).

New York State and New York City parole and probation officers. In recognition of its activities, the Society has received an award for voluntary service from the City of New York.

One individual plaintiff was an inmate at the Bronx House of Detention until August 1970, when he was transferred to Greenhaven Correctional Facility, Stormville, New York. It is alleged that while confined in the Bronx House of Detention he was permitted to receive the Fortune Society newsletter; that following his transfer to Greenhaven he received the August 1970 issue, but that he was not permitted to receive the September 1970 newsletter. The other individual plaintiff was originally confined at the New York City Correctional Facility at Rikers Island. Subsequent to March 1970, he was transferred to the Eastern New York Correctional Facility at Napanoch, New York. In September 1970, he also was refused permission to receive the Fortune Society newsletter, by written memorandum dated September 18, 1970, which reads: "Your request for permission to receive the newsletter printed by The Fortune Society is denied. This correspondence is not allowed by order of Commissioner McGinnis" (a defendant herein). The memorandum was signed "R. J. Henderson, Acting Superintendent" (Eastern New York Correctional Facility, Napanoch, New York), also a defendant herein.

Significantly, in opposing the plaintiffs' motion for preliminary injunctive relief, the defendants have offered no explanation for their ban of the Fortune News or for their continued refusal to permit its delivery to the two individual plaintiffs or to other prisoners at state institutions under the defendants' control. The sole purported explanation comes from the Executive Secretary of The Fortune Society, who states that the organization was informed by the Deputy Commissioner of Correction that the Fortune News was banned in all facilities under the Department's jurisdiction because the publication and the Society's speakers were not reflecting the truth concerning conditions in the state prison facilities. Also it is alleged that the ban continues in effect. These allegations are not put in issue by the defendants, who also do not deny that other publications are permitted to be delivered to prisoners without restriction or ban. The defendants have referred to no rule or regulation nor set forth any standards governing requests by inmates for publications or their delivery to them. They make no claim that the receipt by the individual plaintiffs or any other prisoners of the Fortune News would interfere with or be disruptive of prison discipline or administration.

■ The defendants' sole opposition to this motion is that at this juncture of the litigation the plaintiffs have not established they are entitled to preliminary injunctive relief; that they have failed to prove they will probably succeed on the merits, and that without such injunctive relief they will be irreparably damaged. The Court disagrees. To deprive one of his constitutional rights under the First Amendment, his right to read what he will and when he will, is in this Court's view irreparable and immediate injury. Moreover, upon the unchallenged facts here presented, there is indeed likelihood of success upon the trial.

■ The fact that a man is confined to a penal institution under a valid judgment of conviction does not strip him of all his constitutional rights.[3] while it is true that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by considerations underlying our penal system,"[4] it is

---

3. *See* Cooper v. Pate, Warden, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964) (per curiam); Logan v. United States, 144 U.S. 263, 282–295, 12 S.Ct. 617, 36 L.Ed. 429 (1892); Pierce v. La Vallee, 293 F.2d 233, 235 (2d Cir. 1961).

4. Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948).

equally true that inmates do not lose all their constitutional rights, and that the Due Process and Equal Protection Clauses of the Fourteenth Amendment follow them into prison and there protect them from unconstitutional action on the part of prison authorities carried out under color of state law.[5] Claims by inmates of alleged violation of their constitutional rights by prison administrators, particularly those involving alleged deprivation of fundamental and "preferred" freedoms guaranteed under the First Amendment are subjected to close scrutiny by the courts.[6] We deal with such a right here.

"[T]he Constitution protects the right to receive information and ideas. 'This freedom [of speech and press] * * * necessarily protects the right to receive. * * *' [citing cases] This right to receive information and ideas, regardless of their social worth * * * is fundamental to our free society." [7]

■■ Although a prisoner has only such rights as can be exercised without impairing the requirements of prison discipline.[8] The state's power to impinge

upon his constitutional rights is not without limitation. Only a compelling state interest centering about prison security, or a clear and present danger of a breach of prison discipline, or some substantial interference with orderly institutional administration can justify curtailment of a prisoner's constitutional rights.[9] Here we do not have an issue reasonably and necessarily relating to prison discipline, where courts generally have declined to interfere with the normal management of the institution.[10] The defendants themselves have offered no compelling justification for the ban upon the Fortune News. As already noted, the sole explanation comes from plaintiffs, who assert that apparently the defendants claim that issues of Fortune News do not accurately or fairly reflect true conditions upon which they comment.

■ Assuming arguendo that this is so, it furnishes no basis for the ban of the publication by authorities who feel they have been unfairly criticized or that a false picture has been portrayed of the institutions under their jurisdiction. "Injury to official reputation affords no

5. Washington v. Lee, 263 F.Supp. 327, 331 (M.D.Ala.1966), aff'd per curiam, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968); see also Cooper v. Pate, Warden, 378 U.S. 546, 84 S.Ct. 1733 (1964) (per curiam); Cochran v. State of Kansas, 316 U.S. 255, 257–258, 62 S.Ct. 1068, 86 L.Ed. 1453 (1942); Pierce v. La Vallee, 293 F.2d 233, 235 (2d Cir. 1961); Sewell v. Pegelow, 291 F.2d 196, 198 (4th Cir. 1961); Fulwood v. Clemmer, 111 U.S.App.D.C. 184, 295 F.2d 171 (1961); Coffin v. Reichard, 143 F.2d 443, 445 (6th Cir. 1944) (per curiam), cert. denied, 325 U.S. 887, 65 S.Ct. 1568, 89 L.Ed. 2001 (1945); Siegel v. Ragen, 88 F.Supp. 996, 998 (N.D.Ill.1949), aff'd, 180 F.2d 785 (7th Cir), cert. denied, 339 U.S. 990, 70 S.Ct. 1015, 94 L.Ed. 1391 (1950).

6. Pierce v. La Vallee, 293 F.2d 233, 235 (2d Cir. 1961); see also Cooper v. Pate, Warden, 378 U.S. 546, 84 S.Ct. 1733 (1964) (per curiam); Walker v. Blackwell, 411 F.2d 23, 24 (5th Cir. 1969); Jackson v. Godwin, 400 F.2d 529, 535, 541 (5th Cir. 1968).

7. Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969); see also Griswold v. Connecticut, 381 U.S. 479, 482, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Lamont v. Postmaster General, 381 U.S. 301, 308, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (Brennan, J. concurring); Martin v. City of Struthers, 319 U.S. 141, 143, 63 S.Ct. 862, 87 L.Ed. 1313 (1943).

8. Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049 (1948); Sostre v. McGinnis, 334 F.2d 906, 908 (2d Cir.), cert. denied, 379 U.S. 892, 85 S.Ct. 168 (1964).

9. Jackson v. Godwin, 400 F.2d 529, 541 (5th Cir. 1968); Wright v. McMann, 387 F.2d 519 (2d Cir. 1967). Cf. West Virginia State Board of Education v. Barnette, 319 U.S. 624, 639, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

10. See Sostre v. McGinnis, 334 F.2d 906, 908 (2d Cir.), cert. denied, 379 U.S. 892, 85 S.Ct. 168 (1964); Pierce v. La Vallee, 293 F.2d 233, 234–235 (2d Cir. 1961); Carothers v. Follette, 314 F. Supp. 1014, 1024 (S.D.N.Y.1970).

more warrant for repressing speech that would otherwise be free than does factual error."[11] Free discussion of the problems of society is a cardinal principal of Americanism[12]—it is part of our cherished heritage. Prison administration has been the subject of deep concern in contemporary society. Citizens, public groups and officials, as well as inmates, have been sharply critical of our correctional and penal practices and procedures. Various sectors of the community have charged correctional and prison administrators, and the courts as well, for administrative deficiencies and policies. Whether justified or not, prime responsibility for these alleged shortcomings have been attributed by many, including newspapers, to the courts and prison administrators. However distasteful or annoyed or sensitive those criticized may be by what they consider unfair criticism, half truths or information, it does not justify a ban of the publication carrying the alleged offending comments. Censorship is utterly foreign to our way of life; it smacks of dictatorship.[13] Correctional and prison authorities, no less than the courts, are not above criticism,[14] and certainly they possess no power of censorship simply because they have the power of prison discipline.

In another context where prisoners were denied the right to receive and read authoritative publications of their religious sect, which was held to be an invasion of their constitutional rights, it was stated:

."Mere antipathy caused by statements derogatory of, and offensive to the white race is not sufficient to justify the suppression of regligious literature even in a prison. Nor does the mere speculation that such statements may ignite racial or religious riots in a penal institution warrant their proscription. To justify the prohibition of religious literature, the prison officials must prove that the literature creates a clear and present danger of a breach of prison security or discipline or some other substantial interference with the orderly functioning of the institution."[15]

Under the facts as here presented, no compelling state interest has been advanced to justify the ban of the Fortune News. Its repression can be justified only upon a showing of a clear and present danger to prison discipline or security.[16] The defendants have not even presented a pretext for any such claim. In the absence of such compelling justification, the action of the defendants in refusing the individual plaintiffs permission to receive the Fortune News has been arbitrary and is violative of the individual plaintiffs' First Amendment rights. Their arbitrary action is highlighted by the circumstance that New York City correctional authorities (functioning under state authority) have permitted and continue to permit the distribution of the Fortune News, the very newsletter denied to the individual plaintiffs herein. In this circumstance, not only have the plaintiffs' First Amendment rights been violated, but also their

11. New York Times Co. v. Sullivan, 376 U.S. 254, 272, 84 S.Ct. 710, 722, 11 L.Ed. 2d 686 (1964); *see also* Garrison v. Louisiana, 379 U.S. 64, 73–74, 85 S.Ct. 209. 13 L.Ed.2d 125 (1964); Near v. Minnesota, 283 U.S. 697, 716, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

12. Pennekamp v. Florida, 328 U.S. 331. 346, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946).

13. *Cf.* Times Film Corp. v. Chicago, 365 U.S. 43, 79, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961) (Douglas, J., dissenting).

14. *Cf.* Pennekamp v. Florida, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946); Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941).

15. Long v. Parker, 390 F.2d 816, 822 (3d Cir. 1968); *see also* Jackson v. Godwin. 400 F.2d 529, 535, 541 (5th Cir. 1968).

16. *Cf.* Pennekamp v. Florida, 328 U.S. 331, 334–335, 66 S.Ct. 1029 (1946).

right to the equal protection of the laws under the Fourteenth Amendment.[17]

The motion for a preliminary injunction is granted.

---

17.  *Cf.* Rivers v. Royster, 360 F.2d 592 (4th Cir. 1966).