**Richard X. BROWN, Appellant,**

v.

**C. C. PEYTON, etc., et al., Appellees.**

**No. 13797.**

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 7, 1970.

Decided Feb. 3, 1971.

Alison M. Grey (court-appointed) for appellant.

C. Tabor Cronk, Asst. Atty. Gen. of Va. (Andrew P. Miller, Atty. Gen. of Va., on brief) for appellees.

Before HAYNSWORTH, Chief Judge, and BRYAN and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Plaintiff, an inmate of the Virginia state prison who professes adherence to the Islamic, or Black Muslim, faith, filed a complaint against prison officials alleging that he had been denied permission to subscribe to the newspaper *Muhammad Speaks,* to purchase the book *Message to the Blackman in America* by

Elijah Muhammad, to order Islamic buttons and emblems and an Arabic dictionary and grammar, and to hold prayer meetings together with other members of the Islamic sect. He sued for injunctive relief under 42 U.S.C.A. § 1983 and for damages, apparently under the Federal Tort Claims Act, 28 U.S.C.A. § 1346 et seq.

The district court dismissed the complaint without hearing, after requiring an answer to be filed. The district judge denied relief as to *Muhammad Speaks* and *Message to the Blackman* on the ground that "this matter of censorship" was "solely within the sound discretion of the State Farm officials," relying heavily on this Court's decision in Abernathy v. Cunningham, 393 F.2d 775 (4 Cir. 1968). Plaintiff's claim as to religious and Arabic materials was dismissed without prejudice on the basis of evidence submitted with defendants' answer which indicated that the denial of religious materials was the product of misunderstanding, and that plaintiff would be permitted to obtain them and hold prayer meetings in the future. Damages for previous denials were held unavailable because plaintiff had failed to allege diversity of citizenship.

Plaintiff has appealed. We reverse and remand for further proceedings.

## I

"[I]t has never been held that upon entering a prison one is entirely bereft of all of his civil rights and forfeits every protection of the law." Sewell v. Pegelow, 291 F.2d 196, 198 (4 Cir. 1961). See also Pierce v. La Vallee, 293 F.2d 233 (2 Cir. 1961). This statement was made in a case in which state prisoners were granted the right to seek to establish that they were subjected to discriminatory treatment in prison, including prohibition of the practice of their religion and the wearing of religious symbols, because they were Muslims. We decided that if the evidence sustained their allegations they were entitled to redress. The correctness of the decision in *Sewell* was fully established by Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964). In *Cooper* it was held that an inmate of a state prison who alleged that he was denied permission to purchase certain religious publications and denied other privileges enjoyed by other prisoners solely because of his religious beliefs alleged a cause of action immune to summary dismissal.

■ These cases clearly establish that a prisoner does not shed his first amendment rights at the prison portals. While *Sewell*, if read narrowly, may be treated as an equal protection case, *Cooper* certainly proceeds on the broader basis of the first amendment. Since *Cooper*, it has been increasingly recognized that prisoners retain substantial first amendment rights despite conviction and incarceration. See, e. g., Barnett v. Rodgers, 133 U.S.App.D.C. 296, 410 F.2d 995 (1969); Long v. Parker, 390 F.2d 816 (3 Cir. 1968); Jackson v. Godwin, 400 F.2d 529 (5 Cir. 1968). Persons not incarcerated have the right to believe in and to practice any religious faith, traditional or unorthodox. Fowler v. Rhode Island, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953); Cantwell v. Connecticut, 310 U.S. 296, 60 S. Ct. 900, 84 L.Ed. 1213 (1940). What we must decide here is the extent to which this right survives incarceration.

A number of factors enter into our decision. The rationale of the first amendment is, at least in part, that, particular doctrine aside, devotion to one's religious beliefs is considered to make one a more ethical, intelligent, useful member of society. In the case of persons convicted of crime, the community's need for the development of virtues of this sort is far greater than for those not convicted of crime. One of the principal purposes of incarceration is rehabilitation and rehabilitation is a moral and intellectual process. Criminals and prison communities may be benefited by the free exercise of religion. As the

court observed in Barnett v. Rodgers, 410 F.2d at 1002:

> Treatment that degrades the inmate, invades his privacy, and frustrates the ability to choose pursuits through which he can manifest himself and gain self-respect erodes the very foundations upon which he can prepare for a socially useful life. Religion in prison subserves the rehabilitative function by providing an area within which the inmate may reclaim his dignity and reassert his individuality. (footnotes eliminated.)

■■ While first amendment rights are "preferred" rights, nonetheless, they are not unlimited. The state may restrict religious acts if it can be shown that they pose "some substantial threat to public safety, peace or order," and that there is a " 'compelling state interest in the * * * regulation.' " Sherbert v. Verner, 374 U.S. 398, 403, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963).

■■ Of course, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights * * *." Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). This is true because in the case of prisoners incarcerated under lawful process, there are state interests to justify repression or restriction of first amendment rights beyond the interests which might justify restrictions upon unincarcerated citizens. Prison officials have to confine dangerous men in unpleasant circumstances. They must protect the public at large, prison employees, and also other prisoners, who are almost totally dependent on the prison for their wellbeing. Prison authorities have a legitimate interest in the rehabilitation of prisoners, and may legitimately restrict freedoms in order to further this interest, where a coherent, consistently-applied program of rehabilitation exists. Furthermore, many restrictions on first amendment rights are undoubtedly justifiable as part of the punitive regimen of a prison: confinement itself, for exam-

ple, prevents unlimited communication with the outside world but is permissible in order to punish and deter crime; additional restrictions may be imposed as part of the system of punishing misbehavior within prison. Finally, the state has an interest in reducing the burden and expense of administration. It may, for example, place reasonable restrictions on the number of publications received by each inmate in order to limit the burden of examining incoming materials. But the fact that interests of these sorts frequently arise does not excuse the necessity of a showing that they exist in particular cases.

■ We hold, therefore, that plaintiff's desire to practice his religion may be restricted only upon a convincing showing that paramount state interests so require.

## II

■■ The burden of proving the existence of such interests rests on the state. The burden is not met merely by the filing of an answer which controverts the allegations of the complaint or which relies solely on our previous decision in Abernathy v. Cunningham, *supra*.

In the *Abernathy* case, which the district judge treated as dispositive of plaintiff's right to have access to religious publications, we affirmed the holding of the district court that considerations of discipline justified prison officials in denying an inmate the same publications involved in this case: *Muhammad Speaks* and *Message to the Blackman*. We emphasized that "officials' evaluation of the literature and of its probable effect on relations among the prisoners is not to be lightly regarded." (393 F.2d p. 779) We did not, however, hold that prison officials' judgment was final and unreviewable. The district court decision affirmed in *Abernathy* was based on "an exhaustive evidentiary hearing" (p. 777) and on the finding that the censorship had been based on a "valid and justified concern"

with discipline on the part of prison officials. (p. 779) We verified the findings by "close examination of the book and issues of the newspaper." (p. 779) *Abernathy* thus recognized the probative value of prison officials' judgment, but also recognized the necessity of review of the decisions of prison administrators to insure that the constitutional rights of prisoners are protected. See also McDonough v. Director of Patuxent, 429 F.2d 1189 (4 Cir. 1970).

■ In recognizing the necessity of review of the decisions of prison administrators to insure that the constitutional rights of prisoners are protected, *Abernathy* was correct. While the judgments of prison officials are entitled to considerable weight because they are based upon first-hand observance of the events of prison life and upon a certain expertise in the functioning of a penal institution, prison officials are not judges. They are not charged by law and constitutional mandate with the responsibility for interpreting and applying constitutional provisions, and they are not always disinterested persons in the resolution of prison problems. We do not denigrate their views but we cannot be absolutely bound by them.

■ We conclude that a plenary hearing should be conducted to determine whether the denial to plaintiff of *Muhammad Speaks* and *Message to the Blackman* can be justified by a superior state interest. Although *Abernathy* was concerned with the same publications plaintiff wishes to acquire in the instant case, we do not think that it is dispositive of this aspect of his claim. *Muhammad Speaks* is a periodical. Not every issue warrants judicial scrutiny to determine if there is a paramount state interest in denying access to it, but the character of the publication may alter over a period of time. The period which has elapsed since the dates of the issues considered in *Abernathy* is sufficient to justify a reexamination of their nature and their effect on prison administration.

■ We are told that *Message to the Blackman* is identical to the edition considered in *Abernathy*. As to it, as well as to *Muhammad Speaks*, there are other questions as to which factual inquiry must be made. We recognized in *Abernathy* that Muslim publications are not uniformly banned by prison authorities throughout the United States. We are aware that distribution within penal institutions has increased since the decision in *Abernathy*. The experience of prisons which have permitted Muslim literature should have substantial probative value on the question of the state interests in forbidding access. That experience should be considered together with the opinions of prison officials in determining the effect of access to these publications. Moreover, the district court should consider the use to which plaintiff proposes to put his publications if he obtains them—whether, for example, he intends to use them to proselytize —and whether the prison can impose some restrictions on access and use, short of absolute prohibition, which would serve its purposes satisfactorily. Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Barnett v. Rodgers, *supra*.

■ An evidentiary hearing is also required with respect to plaintiff's claim to have been prevented from ordering Muslim religious buttons and emblems and Arabic language materials. In his complaint plaintiff alleged that he was prevented from purchasing these items. Defendants answered, denying that petitioner was denied the right to purchase them. Attached to the answer were letters from one defendant who is director of the Division of Corrections, Virginia Department of Welfare and Institutions, and the superintendent and assistant superintendent of the institution in which plaintiff is lodged. The letters state that there is no record of any order placed by plaintiff for any of the materials he alleges he desires to purchase, and that no one who may have handled such a request (the identity of such possible persons not being disclosed) has

any knowledge of any such order. In response, plaintiff filed a further pleading, under oath, reiterating that he had been denied the opportunity to purchase "Islamic matter state [sic] in original Bill of Complaint by Employees working under defendants on State farms," and naming individuals to whom he referred. Manifestly, the pleadings raise a factual dispute which must be resolved.

The letters attached to defendants' answer also assert that prayer meetings are permitted on the "Southside" and that prayer meetings will be allowed in the future on the "Northside." On appeal plaintiff does not press his argument that his right to participate in prayer meetings has been abridged. Defendants' answer may render plaintiff's claim to injunctive relief with respect to prayer meetings moot, but the matter may be considered further at the plenary hearing to be conducted if plaintiff persists in claiming that some right has been abridged.

### III

Should the district court, on remand, conclude that plaintiff's first amendment rights have been improperly denied him, he should consider if plaintiff can show his entitlement to damages. Plaintiff's suit was grounded on the Civil Rights Act of 1871, 42 U.S.C.A. § 1983. The Act will support the recovery of money damages for past violations of constitutional rights if damages, past or prospective, are proved, Wall v. Stanly County Board of Education, 378 F.2d 275 (4 Cir. 1967), irrespective of diversity of citizenship or state procedural requirements.

Reversed and remanded.

ALBERT V. BRYAN, Circuit Judge (dissenting):

I disagree with so much of the majority opinion as overturns the trial judge's dismissal of the complaint in respect to the appellant's right to receive *Muhammad Speaks* and *Message to the Blackman.* His ruling is not premised, as the majority opinion intimates, upon incarceration as effecting a loss of "all of [a convict's civil rights]", forfeiture of "every protection of law" or a shedding of the first amendment. In this cause no one avows these tenets. Certainly, penitentiary discipline which limits prisoners' rights can be constitutionally measured only in terms of a necessity commensurate with the protection of the public, the maintenance of institutional order, the safety of the administrators and the advantages of *all* of the inmates, not just the protestants.

Save in exceptional instances the regimen should be left to the officials without judicial interference. Conceding for argument only that the burden is upon the custodian to prove the particular necessity for the regulation in suit, the obligation has been fulfilled here. As the opinion notes, Abernathy v. Cunningham, 393 F.2d 775 (4 Cir. 1968) condemned these very publications. Consequently, I do not see how it can be said that the respondent still has the duty to justify their ban from the prison. If there has been a correction of their sinister character as found by *Abernathy*, I think the appellant should be required to aver and prove it. He has not even attempted to do so, and hence on that head his case fails.

Otherwise, the jailor would have to keep current on the periodical issues of *Muhammad Speaks.* Unless a specific showing is made of a deprivation of innocuous reading matter—constantly and not simply in one edition of the magazine—his custodial hours should not be shifted to an occupation of reading. *Message to the Blackman* has not been changed—at least we are not told of it —and the appellant has not pleaded why it is now acceptable when it was not so two years ago.

Nor can I agree with the Court that the administrative authorities should consider "the use to which plaintiff proposes to put his publications if he obtains them". The suggestion is, I take it, that he could be restricted in passing them or their contents to other prison-

ers. To me this consideration is utterly impracticable. Unless a guard is to be placed beside the prisoner at reading time, or reads to his ward, the publication would be easily broadcast to defeat the regulation.

If the superintendent is unfair to those committed to his care, the remedy is an appeal to those above him. The Virginia prison system is under the general supervision of the Director of the Department of Welfare & Institutions. Va.Code § 53–3. Complaints concerning internal discipline and administration should properly be reviewed by the administrative hierarchy. At least that resort ought to be demanded of the complaint before the courts impose visitations upon the jails, penitentiaries and their keepers. Cf. Paden v. United States, 430 F.2d 882 (5 Cir. 1970).