Daniel NOLAN and Richard Lefebvre, on behalf of themselves and all other inmates of the Massachusetts Correctional Institution, Walpole, and the Massachusetts Correctional Institution, Bridgewater,

v.

John FITZPATRICK, Commissioner of Correction of the Commonwealth of Massachusetts et al.

Civ. A. No. 71-555.

United States District Court,
D. Massachusetts.

May 3, 1971.

Michael B. Keating, John D. Leubsdorf, and Foley, Hoag & Eliot, Boston, Mass., for plaintiffs.

Charles E. Chase, Asst. Atty. Gen. of Massachusetts, Robert H. Quinn, Atty. Gen., Boston, Mass., for defendants.

Max D. Stern and John T. Williams, amici curiae, in support of plaintiffs.

## OPINION

WYZANSKI, Chief Judge.

This case presents the issue whether state prison authorities violate the rights of their prisoners under the First and Fourteenth Amendments to the United States Constitution when the authorities refuse to allow the prisoners to send to representatives of the news media unsealed grievance letters which the authorities have inspected and which they do not claim involve any security risk.

Nolan[1] is confined in the Massachusetts Correctional Institution, Walpole, as a prisoner under a state sentence. Defendant Fitzpatrick is the Commissioner of Correction of the Commonwealth and has general authority over communications to and from prisoners in state correctional institutions. Defendant Moore is Superintendent of Walpole; defendant Sullivan is the Institutional Mail Censor of Walpole; and defendant Butterfield is a correction officer at Walpole. Collectively defendants are here referred to as "the prison authorities" or "the authorities."

In January and February 1971 Nolan wrote and deposited in the prison mail box seven unsealed letters: two to the editor of The Boston Record American, two to different reporters at The Boston Globe, one to the editor of a weekly newspaper, The Phoenix, one to a person, apparently engaged in broadcasting, at radio station WBZ, and one to a person, apparently also a broadcaster at WGBH-TV. None of those letters contained contraband, or plans for escape, or material violating any of the prison rules. Those letters commented on the media's news reports with respect to conditions, and especially a recent strike, at Walpole, and invited the addressee to correspond with Nolan or to communicate with Nolan's lawyer. In writing to Mrs. Goodman at The Boston Globe Nolan also suggested that the reporter "come into this prison and sit down with us and the administration and help us to resolve" grievances. This was the only direct solicitation of a visit or interview by an addressee.

Defendants returned those letters to Nolan, sometimes with a written comment "not allowed," and in each instance "pursuant to the policy of the Massachusetts Department of Corrections prohibiting inmates at Walpole * * * from corresponding with representatives of the news media on matters concerning prison management, treatment of offenders, and personal grievances." [See Stipulation, paragraph 3.]

In adopting and applying the aforesaid policy defendants were implementing the following parts of "Inmate Rules and Regulations of the Massachusetts Correctional Institution approved by the

---

1. Plaintiff LeFebvre now confined in Walpole was formerly confined in Massachusetts Correctional Institution, Bridgewater, but as he is no longer there his claim to send letters hereafter from that institution is moot. He makes no claim that he has suffered compensable damage caused by any defendant's interference with his attempt to send letters from Bridgewater while he was there. His action against defendant Gaughan, Superintendent of Bridgewater, (not against the other defendants) even though it seeks a declaratory judgment as well as an injunction. must be dismissed as moot. McQueen v. Druker, 438 F.2d 781 (1st Cir., 1971).

Governor and Council October 26, 1961":

## "CORRESPONDENCE AND MAIL

Your officer will supply you with a form on which you should list the names and addresses of all those with whom you intend to correspond. This form should be sent to the mail censor for checking and approval. You may not thereafter correspond with anybody whose name is not on this list, unless you have received the prior permission of the mail censor. If it becomes evident at any time that correspondence does not meet approved standards names may be deleted from the correspondence list.

You are permitted to write as many letters as you desire * * * Mail may be deposited in the mail box in your Block at any time. Collections are made by the mail censor after the lines have gone to breakfast. Incoming and outgoing mail is censored in accordance with the authorization form which you have signed. Therefore, you should not seal your letters. * * *

Letters to the Governor, the Commissioner of Correction, the Parole Board, the Superintendent and members of The General Court are not subject to censorship and may be sealed and placed in the boxes provided for that purpose in the corridors.

Letters addressed within this country must be written in English. You may not solicit via mail, though favors may be asked of the immediate family. No letters may be addressed c/o General Delivery.

Letters addressed to business firms will bear the Institutional censor stamp to properly distinguish them from Institutional mail.

Any attempt to get mail of any kind in or out of the Institution except through the regular Institution procedure is a major offense.

Letters will be returned to you or the sender if the Censor feels they do not conform to the standards. * * *"

Nolan wrote twice to the Walpole mail censor, defendant Sullivan, and Nolan's counsel wrote once to defendant Commissioner Fitzpatrick to protest the return of Nolan's letters addressed to the news media. No reply was made to either Nolan or his counsel. There is no administrative remedy provided by Massachusetts law which was available to Nolan to carry his protest further.

Then Nolan and another prisoner at Walpole, LeFebvre, brought on their own behalf and on behalf of each inmate at Walpole, against the defendants heretofore named, this action, pursuant to the substantive civil rights provisions of 42 U.S.C. § 1983, and the jurisdictional provisions of 28 U.S.C. § 1343, seeking declaratory and injunctive relief against defendants' policy of not allowing inmates to mail letters to newspapers, magazines, radio or television stations, other news media, or persons representing such such media.

There is no doubt that this case is properly before this court. The claim falls within 42 U.S.C. § 1983, the court has jurisdiction under 28 U.S.C. § 1343, and the plaintiffs have exhausted such administrative remedies as they may have under state law. Sostre v. McGinnis, 442 F.2d 178 (2nd Cir. 1971); Fortune Society v. McGinnis, 319 F.Supp. 901 (S.D.N.Y.1970); Carothers v. Follette, 314 F.Supp. 1014, 1018–1019 (S. D.N.Y.1970).

After taking jurisdiction the court received from the parties a stipulation of facts, exhibits, and affidavits of defendant Commissioner Fitzpatrick and of Lloyd E. Ohlin, professor of criminology at the Harvard Law School. The parties agreed the affidavits should be treated as the equivalent of testimony. In response to the court's inquiries, the parties after a fortnight's recess declared that they had no other evidence to offer. The class aspect of the action was ignored.

In his affidavit, defendant Fitzpatrick stated that "The Massachusetts Department of Correction fully agrees with the concept that the public has a right to know what goes on in correctional institutions." As ways in which the concept has been realized at Walpole, the Commissioner referred to those who had visited Walpole and to the rights of a prisoner (1) to seek relief in state and federal courts by petitions available to the news media, (2) pursuant to a policy adopted by the Commissioner on April 9, 1971, to dispatch an outgoing letter to a "specific attorney of record in a sealed envelope, not to be opened by any personnel," and (3) in accordance with Mass.G.L. c. 127 § 87 to "write letters to the governor, a member of the general court, the commissioner, parole board and the superintendent, master or keeper of the institution." Commissioner Fitzpatrick did not address himself directly to the question whether there was any special reason why a prisoner should not be allowed to send a letter to a news medium. However he did state that it was his judgment "that inmates should not be automatically permitted an interview with any interested member of the news media." This judgment he rested on general considerations of "security, discipline, good order of the institution and * * * the entire correctional structure."

In his affidavit, Professor Ohlin, who had served as Associate Director of the President's Commission on Law Enforcement and the Administration of Justice, and who had, before coming to Harvard, taught as a Professor of Sociology at the Columbia University School of Social Work, stated that:

"2. So far as I know, no research has been performed on the effects of permitting or forbidding prisoners to correspond with the press. There is no published body of scholarly or professional opinion on whether such correspondence would be a good or a bad thing from the penological viewpoint.

3. When prisoners riot or go on strike, one of their demands is almost always access to reporters. Prisoners often feel that, in ordinary circumstances, they have no effective way of bringing their grievances to public attention. Costly and destructive prison riots are primarily designed to call public attention to felt abuses, rather than to bring about escape. Over the years, despite the good intentions of prison personnel, public concern and newspaper publicity have tended to be indispensable factors in bringing about prison reform, and these in turn have often resulted from prison disorders. Although one can never be sure, I think there is a good chance that letting prisoners correspond with newspapers and broadcasters would facilitate prison discipline by providing prisoners with a nonviolent and effective outlet for their grievances. In general, I think that the development of more effective correctional practices would be helped by greater ventilation of prison problems.

4. To the extent that correspondence with the press actually brought about reforms making prisons more effective and humane, it would, of course, favor the rehabilitation of prisoners. Being allowed to write to the press might itself help to rehabilitate some prisoners by helping to make them feel able to accomplish something by their own efforts and without violating the law. It seems to me that allowing correspondence with the press would be more likely to help than to harm the rehabilitation process."

Turning to the questions of law, we start with the familiar propositions that "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." [Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948),] but that a prisoner's freedom of communication cannot be curtailed except on the basis of a rational relationship to those considerations. [Jackson v. Godwin, 400

F.2d 529 (5th Cir., 1968); Carothers v. Follette, 314 F.Supp. 1014 (S.D.N.Y. 1970); Fortune Society v. McGinnis, 319 F.Supp. 901 (S.D.N.Y.1970).]

Plaintiffs have not challenged the "Correspondence and Mail" provisions of the "Inmate Rules and Regulations of the Massachusetts Correctional Institution, Walpole Approved by the Governor and Council Oct. 26, 1961." They apparently regarded those provisions at least on their face, and apart from their application to particular correspondence as "justified by the considerations underlying our penal system," Price v. Johnston, *supra.* See Sostre v. McGinnis, 442 F.2d 178 (2nd Cir. 1971); Brown v. Peyton, 437 F.2d 1228, 1231 (4th Cir. 1971); Lee v. Tahash, 352 F.2d 970 (8th Cir. 1965); McCloskey v. Maryland, 337 F.2d 72 (4th Cir. 1964); Carothers v. Follette, 314 F.Supp. 1014, 1024 (S.D.N.Y.1970). In Brown v. Peyton, *supra,* Circuit Judge Winter gave this illuminating review of some of those considerations:

"Prison officials have to confine dangerous men in unpleasant circumstances. They must protect the public at large, prison employees, and also other prisoners, who are almost totally dependent on the prison for their wellbeing. Prison authorities have a legitimate interest in the rehabilitation of prisoners, and may legitimately restrict freedoms in order to further this interest, where a coherent, consistently-applied program of rehabilitation exists. Furthermore, many restrictions on first amendment rights are undoubtedly justifiable as part of the punitive regimen of a prison: confinement itself, for example, prevents unlimited communication with the outside world but is permissible in order to punish and deter crime; additional restrictions may 'be imposed as part of the system of punishing misbehavior within prison. Finally, the state has an interest in reducing the burden and expense of administration. It may, for example, place reasonable restrictions on the number of publications received by each inmate in order to limit the burden of examining incoming materials. But the fact that interests of these sorts frequently arise does not excuse the necessity of a showing that they exist in particular cases."

What plaintiffs challenge is defendants' application of Walpole's correspondence and mail rules "pursuant to the policy of the Massachusetts Department of Corrections prohibiting inmates from corresponding with representatives of the news media on matters concerning prison management, treatment of offenders, and personal grievances." That challenge requires this court to consider both whether the authorities' policy of discriminating against a particular class of communications is unreasonable and whether plaintiff has an affirmative right to send to the news media grievance letters which the authorities have inspected and which they do not claim involve any security risk.

■ The power which the prison authorities have to control mail to and from a prisoner may not be used to discriminate on the basis of race [Jackson v. Godwin, 400 F.2d 529 (5th Cir. 1968)], or religion [see Walker v. Blackwell, 411 F.2d 23, 29 (5th Cir. 1969)], or, it seems, hostile criticism of the prison authorities [Carothers v. Follette, 314 F.Supp. 1014, 1024–1026 (S.D.N.Y. 1970), (critical letter sent *by* prisoner but uncommunicated to other prisoners); Fortune Society v. McGinnis, 319 F.Supp. 901, 904–905 (S.D.N.Y.1970), (critical publication sent *to* a prisoner).]

Plaintiffs contend that the prison authorities may not use a policy of class discrimination against all letters sent by prisoners to representatives of the news media or matters concerning prison management, treatment of offenders, and personal grievances because that policy has no reasonable basis when the letters are open to inspection.

The class discrimination is not supported by any security considerations. Representatives of news media are not inherently security risks. Grievance

communications do not generally present security problems. The authorities have adequate security protection in their right to read every letter to the news media and to refuse to allow any letter to be sent if the particular addressee or letter involves a security risk.

■■ The class discrimination is not supported by any consideration related to the rehabilitation of prisoners, or their punishment, or the deterrence of them or others.[2] Prisoners already have the right to send to public officials complaining letters [see Sostre v. McGinnis, 442 F.2d 178 (2nd Cir. 1971)], and indeed in Massachusetts this right is codified in Mass.G.L. c. 127 § 87, heretofore quoted. Prisoners have been thought also to have the right to send complaining letters privately to members of their families. [Carothers v. Follette, 314 F. Supp. 1014, 1024–1026 (S.D.N.Y.1970).] Under these circumstances to refuse a prisoner the right to send a grievance letter to the press can hardly be justified on the ground that it will make him more submissive to authority, or teach him to obey without question or complaint, or subject him to deserved suffering, or deter potential wrongdoers. Nor is there any reason to suppose that if other prisoners learn about the letter through its publication they will become unruly. Indeed Professor Ohlin's affidavit indicates that publicity achieved by a complaining prisoner may make his fellow prisoners less likely to create disturbances.

This brings us to the question whether the class discrimination against grievance letters mailed to representatives of news media had reasonable justification "in reducing the burden and expense of administration." Brown v. Peyton, 437 F.2d 1228, 1231 (4th Cir. 1971). No one suggests that reading the letters is burdensome. What apparently gives defendant Commissioner Fitzpatrick concern is that the grievance letters will lead representatives of the news media to visit prisons and seek interviews and that those visits will create administrative, security, and disciplinary problems. If the grievance letters do lead, as no doubt sometimes they will, to requests by reporters for interviews, that does not mean that the two are legally intertwined. Moreover, as Professor Ohlin's affidavit discloses letters have independent practical significance as a method of bringing prisoners' grievances to public attention, as a psychological release for prisoners, and as a reconstructive step in their rehabilitation. Therefore, all that this court needs to consider now is the prisoners' claimed right to mail letters, not whether the prisoner or the reporter or both would have a constitutional right to an interview. Yet in considering merely the letters it is fair to recognize that often they will create for the prison administrators the burden either of being subject to unanswered adverse criticism, or of answering the criticism by their own statements or by giving reporters an opportunity to make their own check, or by both methods. We ought not to minimize this burden. It takes time, expense, and sometimes additional personnel to respond to criticism. Sometimes irresponsible representatives of the media distort or ignore the authorities' response, or take a partisan or melodramatic position to attract readers or audiences. But risks of misrepresentation are the usual incidents of public office.

2.  Mail may be controlled, prohibited, or regulated not merely in order to rehabilitate prisoners but to punish them or to deter them from committing crime. See Brown v. Peyton, 437 F.2d 1228, 1231 (4th Cir., 1971). So long as they are not subjected to cruel and unusual punishment prisoners may be made to suffer as a punishment for wrong done, and they may be deprived of pleasures enjoyed by people not in prison so that such potential disagreeable deprivation may operate as a deterrent to potential criminal offenders. It is probably because of its punitive or deterrent effect that a limitation upon the number of letters which a prisoner may send or receive has been upheld. Lee v. Tahash, 352 F.2d 970 (8th Cir., 1965).

They are not the type of administrative burdens which authorities are entitled to avoid by mail controls or other regulations. As Judge Weinfeld observed in Fortune Society v. McGinnis, *supra*, 319 F.Supp. at p. 905:

"However distasteful or annoyed or sensitive those criticized may be by what they consider unfair criticism, half truths or information, it does not justify a ban of the publication carrying the alleged offending comments. Censorship is utterly foreign to our way of life; it smacks of dictatorship. Correctional and prison authorities, no less than the courts, are not above criticism, and certainly they possess no power of censorship simply because they have the power of prison discipline."

In short, none of the "considerations underlying our penal system" appears to warrant prison authorities in making the class discrimination inherent in a policy of uniformly prohibiting prisoners from sending grievance letters to the news media while permitting prisoners to communicate with others individually approved by the prison authorities.

If this court were to stop at this point plaintiffs would be entitled only to a decree invalidating defendants' policy discriminating against prisoners' grievance letters to news media as a class. A question might then be raised as to whether prison authorities would retain power to reject particular grievance communications to the news media not only on the clearly proper ground that the addressee or the communication was a security risk [see Carothers v. Follette, 314 F.Supp. 1014 (S.D.N.Y., 1970)] but on the ground that "as part of the punitive regimen of a prison" [Brown v. Peyton, 437 F.2d 1228, 1231 (4th Cir., 1971)] and quite apart from punishing misbehavior in the prison, the authorities may require (as Walpole in fact does) advance approval of addressees and of communications. With respect to ordinary communications from a prisoner to an ordinary person outside the prison it has been held that prison authorities have a judicially unreviewable power to deny the privilege of mailing. Diehl v. Wainwright, 419 F.2d 1309 (5th Cir., 1970). Presumably courts upholding a selective system of controlling outgoing mail have assumed that just as the prison authorities as part of the punitive regimen of a prison may limit the number of communications sent by a prisoner [Lee v. Tahash, 352 F.2d 970 (8th Cir., 1965). See McCloskey v. Maryland, 337 F.2d 72 (4th Cir., 1964).] it may limit the addressees or communications to those affirmatively approved by the prison authorities. This assumption is difficult to reconcile with the decisions holding that the prison authorities may not limit incoming mail to communications affirmatively approved by them. Jackson v. Godwin, 400 F.2d 529 (5th Cir., 1868); Brown v. Peyton, 437 F.2d 1228 (4th Cir., 1971); Fortune Society v. McGinnis, 319 F.Supp. 901 (S.D.N.Y., 1970). In short, it is not clear, in view of the First Amendment rights of prisoners, whether, absent factors of security, rehabilitation of prisoners, administrative burdens, punishment for misbehavior while in prison, the prison authorities have the right, as part of their general power to maintain a punitive regimen "in order to punish and deter crime" [Brown v. Peyton, 437 F.2d 1228, 1231 (4th Cir., 1971)] to limit outgoing mail to addressees and communications of which they approve.

However, even if the prison authorities do have, in general, a power to establish an affirmative selective system for correspondence (a question not here decided) there remains the problem whether a prisoner has a special right to send a grievance letter (not necessarily a letter on other matters of public interest, such as whether the city should build a sports stadium) to a representative of the news media,—of course, always on the condition that the particular addressee and the particular communication do not, in the reasonable discretion of the prison authorities, involve a security risk.

It frequently has been held that a prisoner has a special right to send, without the necessity of obtaining approval of the prison authorities, a letter or petition to a court [Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941),] or to his counsel, [Nolan v. Scafati, 430 F.2d 548 (1st Cir., 1970)] or to a public official [Sostre v. Mc-Ginnis, 442 F.2d 178 (2nd Cir., 1971)]. Such communications, however, have been thought to be *sui generis*, Sostre v. McGinnis, 442 F.2d 178 (2nd Cir., 1971). They involve freedom of access to the courts and freedom of petition to the government. If the authorities could deny a prisoner a right to send to a court a letter or petition, or to send to his lawyers a letter or petition, the authorities in effect could often deny him the chance to achieve a judicial remedy which the law intends to allow him.

It also has been held that a prisoner has a special right to communicate without interference, except on security grounds, with a religious leader "for the limited purpose of seeking spiritual advice." Walker v. Blackwell, 411 F.2d 23, 29 (5th Cir., 1969).

The instances just cited furnish some support for plaintiff prisoners' claim that they have a right to send grievance letters, provided they involve no security risk, to representatives of the news media. But plaintiffs' affirmative claim rests less on analogy than on the argument that they have the right to appeal for the redress of grievances not only to the courts and to the elected and appointed representatives of the people, but to the people themselves, and that such people are best reached by communications with the news media. It is a claim primarily with respect to plaintiffs' freedom of speech. It is unnecessary to consider whether, because plaintiffs direct their messages to the press, freedom of the press is involved, or whether, because the hope is that the messages will reach the people who will address officeholders, freedom of petition is involved.

The strength of this claim is that the suppression of grievance claims, no matter to whom made, does not, at least in modern times, strike most persons[3] as being justified by punitive, deterrent or other considerations underlying our penal system. Moreover, some grievances of prisoners may be legitimate and yet may not be within the scope of legal remedies in court, or even within the potential practical political achievements of a governor and of a legislature without an increased sensitivity and awareness on the part of the general public. In some cases it is as essential to the cure of the prisoner's grievance that he be able to reach the court of public opinion as that he reach a judicial court or the General Court of Massachusetts.

Moreover, it is difficult to see what considerations underlying our penal system argue against the prisoners' claim to send their unsealed grievance letters to the press. See Palmigiano v. Travisono, 317 F.Supp. 776 (D.R.I., 1970), (an admittedly distinguishable case because it involves persons held for trial, not convicts). As already noted, security considerations are effectively dealt with when letters are left open for inspection and are subject to return if they contain any contraband, or plan of escape, or device for evading prison regulations. There have not been shown any administrative considerations of significance which support a prohibition of a grievance letter to a news medium so long as the right to send a letter does

---

3. No doubt there are some persons who believe that the suppression of grievance claims is justifiable to teach persons that kind of obedience which is best described as submissiveness—a docility and immediacy of response which has sometimes been thought a desirable characteristic of prison discipline, monastic orders, and military organizations. But while such strict views may be reasonable they hardly meet the test of compelling state interests. See Jackson v. Godwin, 400 F.2d 529, 541 (5th Cir., 1968); Barnett v. Rodgers, 133 U.S.App. D.C. 296, 410 F.2d 995 (1969).

not imply as an essential concommitant the right of the prisoner or of a reporter to follow-up personal interviews. Nor is it reasonable as a punishment for the crime the prisoner committed before he was imprisoned, or as a way of deterring potential offenders, to deny prisoners the right to offer through the press their pleas for correction of prison conditions or adjustment of grievances.

It must be emphasized that in this case neither the record nor arguments of counsel reveal any serious adverse consequences reasonably to be apprehended from permitting prisoners to send grievance letters to the press. Prison officials seem now to be without relevant experience either in their own or other prisons as to the effect of allowing grievance letters from prisoners to the press, the radio, and TV. All that has been contended is that prisoners' letters may lead to reporters' requests for interviews with prisoners, and that such interviews, if, but only if, they were allowed might cause security risks or disturbance. Should presently unforeseen unfortunate consequences follow from recognizing prisoners' claims to send grievance letters to the news media, then on the strength of proof in a subsequent case prison authorities might have a justifiable basis, indeed the state might have compelling reasons, for suppressing the expression of grievances by prisoners' letters to the press. On this record, in the absence of proof of the potential harm of grievance letters, to sustain their suppression is to do more than to allow authorities reasonable scope for the performance of their difficult tasks. It is to permit the prison authorities to govern men's lives on the basis of conjecture or of unexamined habits not on the basis of expertness or experience.

■ Plaintiffs are entitled to have a declaration that if either of them while a prisoner at Walpole writes to any news medium, (including a newspaper, a periodical, another medium of the press, a radio station and a television station)

or any news representative thereof, an unsealed letter concerning prison management, treatment of offenders, or personal grievances, and if the prison authorities do not have reasonable ground (not necessarily probable cause) to believe that the contents of the letters or the addressee of the letters presents a risk (a) to the security of the public, the prison administration, or the prison population, or (b) to observance of rules of behavior by prisoners, or (c) to the rehabilitation of prisoners, he has a right under the First and Fourteenth Amendments to the United States Constitution to have the letter deposited in the mail and not withheld or returned by the defendants, above described.

Plaintiffs are also entitled to an injunction to the same effect against defendants other than Gaughan. The action against Gaughan should be dismissed.

## JUDGMENT

This case having come on for hearing and evidence having been taken, arguments heard, and an opinion rendered, it is declared and adjudged that:

1. If either Daniel Nolan or Richard LeFebvre while a prisoner at Walpole writes to any news medium (including a newspaper, a periodical, another medium of the press, a radio station and a television station) or any news representative thereof, an unsealed letter concerning prison management, treatment of offenders, or personal grievances, and if the prison authorities do not have reasonable ground (not necessarily probable cause) to believe that the contents of the letter or the addressee of the letter presents a risk (a) to the security of the public, the prison administration, or the prison population, or (b) to the observance of rules of behavior by prisoners, or (c) to the rehabilitation of prisoners, he has a right under the First and Fourteenth Amendments to the United States Constitution to have the letter deposited in the mail and not withheld or returned by the defendants John Fitzpa-

**218**

trick, Robert J. Moore, Paul Sullivan and Ralph Butterfield.

2. Defendants John Fitzpatrick, Robert J. Moore, Paul Sullivan and Ralph Butterfield are enjoined from withholding from the mails any letter written by either Daniel Nolan or Richard LeFebvre while a prisoner at Walpole to any news medium (as defined in the preceding paragraph) or any news representative thereof, provided that the letter is delivered to them unsealed and concerns prison management, treatment of offenders, or personal grievances, and provided that they do not have reasonable ground (not necessarily probable cause) to believe that the contents of the letter or the addressee of the letter presents a risk (a) to the security of the public, the prison administration, or the prison population, or (b) to the observance of rules of behavior by prisoners, or (c) to the rehabilitation of prisoners.

3. The action of plaintiffs Daniel Nolan and Richard LeFebvre against defendant Charles Gaughan is dismissed.

4. No costs shall be allowed.