Gordon **BAUGHMAN**

v.

**COOPER–JARRETT, INC.,** et al.

**Civ. A. No. 72–466.**

United States District Court,
W. D. Pennsylvania.

March 31, 1975.

John W. McIlvaine, Washington, Pa., for plaintiff.

Richard L. Rosenzweig, Pittsburgh, Pa., for defendant, Wilson Freight Company.

## OPINION AND ORDER

KNOX, District Judge.

Plaintiff Gordon Baughman, an over-the-road truck driver, originally brought this civil antitrust action against his former employer Cooper-Jarrett, Inc. and four other trucking companies alleging that the defendants engaged in a conspiracy in restraint of trade to blacklist him from obtaining work in the trucking industry. The complaint charged that the defendants violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 et seq. and included a pendent state claim for tortious interference with prospective contractual relationships under Restatement, Torts § 766.

During the first trial of this action commencing on January 9, 1974, the court ruled that no cause of action had been made out under Section 2 of the Sherman Act and also determined that the pendent state claim, if it existed, could only be maintained against defendant Cooper-Jarrett, Inc. At the conclusion of the evidence, the court granted a directed verdict in favor of defendant Braun's Baking Company a/k/a Continental Baking Company, Inc. on the grounds that there was no evidence that this corporation engaged in interstate commerce and there was insufficient evidence to show that this defendant participated in the alleged conspiracy to blacklist the plaintiff. As for the other defendants, the jury rendered a special verdict in which it found damages against Cooper-Jarrett, Inc., Matlack, Inc., and Wilson Freight Company for violation of Section 1 of the Sherman Act while absolving National Freight Lines of any liability. The jury further found damages against Cooper-Jarrett, Inc. for wrongfully inducing other trucking companies to refuse to hire the plaintiff as alleged in the pendent state claim.

Following entry of judgment on the verdict, defendants Cooper-Jarrett, Matlack, and Wilson filed Motions for Judgment NOV and for a New Trial. In an Opinion and Order of August 20, 1974, the court denied the Motions for Judgment NOV, but granted the Motions for a New Trial on the ground that the closing address of plaintiff's counsel to the jury was replete with prejudicial remarks.

In the second trial commencing on October 9, 1974, the plaintiff proceeded against defendants Cooper-Jarrett, Inc., Matlack, Inc., and Wilson Freight Company. After the jury was sworn, but prior to plaintiff's opening statement, the plaintiff entered into a settlement agreement with Cooper-Jarrett and Mat-

lack whereby Cooper-Jarrett agreed to pay $37,500 and Matlack agreed to pay $22,500 or a total of $60,000 to the plaintiff in return for a joint tortfeasor release. Although the plaintiff withdrew with prejudice the pendent state claim, the agreement provided that the payment by Cooper-Jarrett was limited to settlement of the antitrust claim. The plaintiff expressly reserved all of his rights against Wilson Freight Company, the remaining defendant.

At the close of the evidence in the second trial, the court instructed the jury that if Wilson Freight Company were found to have joined a conspiracy to blacklist the plaintiff in violation of Section 1 of the Sherman Act, damages could be determined only from the date when Wilson joined the conspiracy. This instruction was given at the request of the defendant and agreed to by the plaintiff. The jury returned a verdict for the plaintiff in the amount of $25,000 actual damages and on October 21, 1974, the court ordered that judgment be entered against Wilson for $75,000 after trebling under 15 U.S.C. § 15. The court further ordered that the plaintiff was entitled to counsel fees, expenses, and costs to be determined at a later hearing.

Defendant Wilson Freight Company now presents this court with a Motion for Judgment NOV pursuant to Rule 50(b) of the Federal Rules of Civil Procedure asserting that there was no competent admissible evidence to show that Wilson engaged in a conspiracy to backlist the plaintiff. Wilson also has filed a Motion for Reduction of Judgment claiming that the judgment should be reduced to $15,000 because Wilson is entitled to a credit for the $60,000 in settlement payments by its co-conspirators, Cooper-Jarrett, Inc. and Matlack, Inc. to be deducted from the $75,000.

### A. Motion for Judgment NOV

Wilson Freight Company presents a Motion for Judgment NOV claiming that the court erred in admitting certain hearsay declarations and, therefore, there was no competent evidence showing that Wilson engaged in a conspiracy to blacklist the plaintiff. The statements in issue, related by plaintiff's witnesses during the trial, allegedly were made by Clarence Frankel of Cooper-Jarrett, Inc., Claire Umberger of Wilson and Randy Clark of Matlack, Inc. In considering this motion, the court must view the evidence in the light most favorable to the party who won the jury verdict—in this case the plaintiff. 5A J. Moore, Federal Practice ¶ 50.07 at 2356–57. For the reasons stated below, the defendant's motion will be denied.

The plaintiff's contention in this case was that after firing the plaintiff, Cooper-Jarrett, Inc. enlisted other trucking companies in a common effort to prevent the man from obtaining further employment. The evidence produced at trial showed that the plaintiff was employed as an over-the-road truck driver by Cooper-Jarrett until he was fired on October 23, 1970. The plaintiff testified that when he was fired, Clarence Frankel, a Vice-President of Cooper-Jarrett, stated: "He [plaintiff] will not drive any of Cooper-Jarrett's trucks ever again nor will he drive for any other freight company." (Trans. No. 1 at page 17).

Wilson argues that this statement constitutes inadmissible hearsay which does not fall within the co-conspirator exception because it was made before any conspiracy could have begun. While we agree that there may not have been two or more conspirators involved at that point in time, Frankel's statement falls within another exception to the hearsay rule. A person's declaration of intent to perform an act is admissible as tending to show that the act was in fact carried out as planned. See Mutual Life Insurance Co. v. Hillmon, 145 U.S. 285, 295–96, 12 S.Ct. 909, 36 L.Ed. 706, 710 (1892); Blackburn v. Aetna Freight Lines, Inc., 368 F.2d 345, 348 (3d Cir. 1966) (dictum); United States v. Annunziato, 293 F.2d 373, 377 (2d Cir.), cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961); Nuttall v. Read-

ing Co., 235 F.2d 546, 551 (3d Cir. 1956); Commonwealth v. Santos, 275 Pa. 515, 119 A. 596, 599 (1923). Accordingly, we find that Frankel's statement was relevant and admissible to prove that Cooper-Jarrett thereafter contacted Wilson and other trucking companies in an effort to blacklist the plaintiff.

The defendant's second objection is to certain alleged statements by Claire Umberger who is the Relay Supervisor or local manager for Wilson Freight Company at the company's terminal in New Stanton, Pennsylvania. The evidence indicated that the plaintiff went to Wilson's New Stanton terminal and filed an application for employment on August 24, 1971. The plaintiff testified that when he returned about seven to ten days later to check on his application, Umberger stated: ". . . the word was out from Cooper-Jarrett that I [plaintiff] was blacklisted, that he [Umberger] could not hire me." (Trans. No. 1 at p. 35). This testimony was corroborated by Ross Fait who accompanied the plaintiff to the Wilson terminal.[1] The jury may well have inferred from this statement that Cooper-Jarrett had secured the cooperation of Wilson in its efforts to blacklist the plaintiff.

The defendant argues that this declaration constitutes inadmissible hearsay because Umberger did not have actual authority to make a statement admissible against Wilson on the subject of a conspiracy. Wilson interprets the law too narrowly if it means to imply that the plaintiff must show that Umberger was expressly authorized to inform the plaintiff that he was the target of an illegal conspiracy. Conspiracies are secretive by their very nature, and such a requirement would unduly burden their innocent victims from obtaining relief. Considering all the facts presented, we find that Umberger's statement falls within the admission of a party exception to the hearsay rule because it was made within the scope of his authority.

In Moran v. Pittsburgh-Des Moines Steel Co., 183 F.2d 467 (3d Cir. 1950), the Third Circuit stated that admissions made by an agent of a party are admissible when the agent's powers are broad enough to constitute him the general representative of the principal with broad managerial responsibilities. See also Johnson v. Yost Lumber Co., 117 F. 2d 53, 59–60 (8th Cir. 1941) (statements of local lumber yard managers held admissible against defendant lumber companies in action to recover damages under Sherman Act for conspiracy to boycott the plaintiff). Umberger appears to have such broad managerial responsibility because he was the head man at the New Stanton terminal. According to his own testimony, Umberger was charged with the management of all personnel at the New Stanton terminal and was responsible for overseeing the movement of freight inbound and outbound and for the preservation of property and equipment. (Trans. No. 1 at 212–13). Umberger was more than a mere subordinate in the company; he was Wilson's manager on the scene at the New Stanton locality.

The defendant claims that Umberger was only a middleman with respect to hiring and firing and refers to testimony by Umberger and James Mathias, Wilson's Vice President of Operations, that applications were forwarded to the company's home office in Cincinnati, Ohio where a final decision on hiring would be made. Even though the ultimate decision as to hiring may have been made in Cincinnati, Umberger still played a major role in that process. The undisputed evidence indicated that Umberger and his assistant, Roger Lewis, conducted a preliminary screening of all applications and retained all but those few which were forwarded to the home office. To the extent that certain applications were held at the New Stan-

---

1. Although Fait did not testify in person at the second trial, his testimony at the January 1974 trial was read into the record.

ton terminal, Umberger played a key role in denying those men employment.

Even though Umberger may not have had the ultimate authority to hire drivers, he appears to have had either express or implied authority to tell an applicant whether or not he was hired and the reasons why. He was the manager of the local terminal and dealt directly with the applicants. As stated by James Mathias, as far as the average man seeking a job at the New Stanton terminal was concerned, Umberger was the man in charge of hiring (Trans. No. 1 at p. 274). Considering all the circumstances, we conclude that Umberger's statement that "the word was out from Cooper-Jarrett" was made within the scope of his authority as Relay Supervisor or local manager at the New Stanton terminal.

Finally, Wilson objects to the introduction of certain alleged statements by Randy Clark, Manager of the Matlack Inc. terminal at Adamsburg, Pennsylvania. Tony Stanrajh, an over-the-road truck driver for Matlack, testified that after being fired from Cooper-Jarrett the plaintiff requested Stanrajh to speak with Clark about hiring the plaintiff. Stanrajh further testified that even though Matlack was hiring other people and even though Clark earlier had praised the plaintiff's driving ability, Clark told him: ". . . he [Clark] couldn't put him [plaintiff] on right now even if he was his own brother, and that, he says, anyway, the word was out from Cooper-Jarrett that he better not hire him because he would just probably make trouble at the terminal." (Trans. No. 1 at p. 133). The jury could well have concluded from this statement that Cooper-Jarrett had contacted Matlack in an effort to deny the plaintiff employment.

■ The defendant argues that the statement was irrelevant and inadmissible because Clark did not mention Wilson Freight Company and, therefore, there is no basis for inference of an illicit conspiracy involving Wilson. The facts of this case are similar to those in Flintkote Co. v. Lysfjord, 246 F.2d 368 (9th Cir. 1957), a civil action under the Sherman Act in which the plaintiff settled with certain defendants prior to trial and proceeded against the remaining defendant which allegedly joined an existing conspiracy. The Ninth Circuit noted that the plaintiff had to establish both the prior existence of the conspiracy and the remaining defendant's subsequent connection with it before evidence of the acts or statements of alleged co-conspirators would be admissible against the defendant. We agree with that court that the trial court has broad discretion in the admission of evidence which tends to establish conspiracy and that the order of proof may be governed by the "rule of convenience". 246 F.2d at 377–79. It is clear that the plaintiff introduced this statement by Clark to show the existence of an on-going conspiracy involving Cooper-Jarrett and Matlack. When coupled with statements of Claire Umberger, which we have held to be admissible as admissions by Wilson, the plaintiff has produced sufficient evidence for the jury to find that Wilson joined an existing conspiracy to blacklist the plaintiff.

■ The defendant also argues that Clark's statement introduced through Stanrajh was inadmissible hearsay because it did not fall within the co-conspirator exception to the hearsay rule. In Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the Supreme Court stated that under the co-conspirator doctrine the declarations of one conspirator in furtherance of the objects of the conspiracy made to a third party are admissible against his co-conspirators. The court noted, however, that such declarations are admissible over the objection of an alleged co-conspirator, who was not present when they were made, only if there is proof aliunde that he is connected with the conspiracy. 315 U.S. at 74, 62 S.Ct. at 467, 86 L.Ed. at 701. See also Todhunter-Mitchell & Co., Ltd. v. Anheuser-Busch, Inc., 375 F.Supp. 610, 624 (E.D.

Pa. 1974). The purpose for the rule requiring independent evidence of a conspiracy is to prevent otherwise inadmissible hearsay to lift itself by its own bootstraps to the level of competent evidence merely by implicating the objecting party as a co-conspirator. We find, however, that the statements by Frankel of Cooper-Jarrett and Umberger of Wilson, which are admissible under other exceptions to the hearsay rule, provide sufficient proof aliunde that a conspiracy existed to permit Clark's statement to be admissible under the co-conspirator exception.

In the light of the foregoing, the court holds that there was sufficient evidence if believed by the jury, to fasten liability upon defendant Wilson.[2]

As to liability generally, it is the opinion of the court that such conduct as was found by the jury to exist does violate the antitrust laws. *See* Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); Nichols v. Spencer International Press, Inc., 371 F.2d 332 (7th Cir. 1967); Blalock v. Ladies Professional Golf Association, 359 F.Supp. 1260 (N.D.Ga.1973). It was there pointed out that the little man is as much entitled to be protected from violation of the antitrust laws as is the large business entity.

B. *Motion for Reduction of Judgment*

Defendant Wilson Freight Company also presents a Motion for Reduction of Judgment based on the fact that its alleged co-conspirators—Cooper-Jarrett, Inc. and Matlack, Inc.—have made certain payments in settlement of claims against them in this action. Prior to plaintiff's opening statement in the October 9, 1974 trial, the plaintiff agreed to accept $32,500 from Cooper-Jarrett and $27,500 from Matlack in return for granting those two defendants a joint-tortfeasor release from the antitrust claim. Wilson argues that since the plaintiff is not entitled to recover twice for the same damages, this $60,000 settlement amount must be deducted in full from the $75,000 judgment against Wilson. The plaintiff, however, contends that in making the settlement agreement with Cooper-Jarrett and Matlack, he expressly reserved all his rights against Wilson, the remaining defendant, and no reduction should be made. He argues that the jury's verdict represents damages found only against Wilson and, therefore, there will be no double recovery requiring any reduction of the $75,000 judgment.

The question of what amount, if any, of the prior settlement must be set off against plaintiff's judgment against Wilson is governed by Zenith Radio Corporation v. Hazeltine Research, Inc., 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). In this case, Hazeltine Research, Inc. sued Zenith Radio Corporation for patent infringement, and Zenith filed a counterclaim alleging that Hazeltine violated the federal antitrust laws by participating in patent pools in Canada, Great Britain, and Australia. As one defense Hazeltine argued that it was protected from liability by a release executed by Zenith in settlement of a prior antitrust action against other co-conspirators in the Canadian patent pool, even though Hazeltine was neither a party to that prior action nor a party to the release. The Supreme Court held that the effect of a release upon co-conspirators shall be determined in accordance with the intentions of the parties, and it was clear that the parties did not intend Hazeltine to benefit from the release in question. 401 U.S. at 345–48, 91 S.Ct. at 809, 28 L.Ed.2d at 96–97. The Court stated, however, that entirely apart from any release, Hazeltine might have avail-

2. In this opinion, the court has not discussed the argument that the blacklisting or boycotting of an individual truck driver by a group of trucking companies does not constitute a violation of the antitrust laws. This question was dealt with in extenso in the opinion and order dated August 20, 1974, following the first trial and to which reference is made for a complete dissertation on this point which was not pressed by Wilson in its argument on the present NOV motion.

able a defense of payment arising from the prior settlement because a plaintiff who has recovered any item of damages from one co-conspirator may not again recover the same item from another co-conspirator. 401 U.S. at 348, 91 S.Ct. at 811, 28 L.Ed.2d at 97. *See also* Wainwright v. Kraftco Corporation, 58 F.R. D. 9, 11–12 (N.D.Ga.1973).

■■ Likewise, in the present case Wilson cannot claim that it was covered by the joint-tortfeasor release because the plaintiff expressly reserved all his rights against Wilson. (Trans. No. 1 at page 5). According to *Zenith*, however, the remaining defendant is entitled to a defense of payment to the extent that the $60,000 settlement with Cooper-Jarrett and Matlack covers items of damages included in the $75,000 judgment against Wilson. The problem, therefore, is to determine the overlap between the settlement amount and the judgment against Wilson.[3]

Wilson argues that the $60,000 settlement amount should be deducted in full from the $75,000 judgment, citing *Essaness Theatres Corporation v. Balaban & Katz Corporation*, Trade Reg.Rep. (1955 Trade Cases) ¶ 68,152, at 70,735 (N.D. Ill.1955). In *Essaness Theatres* the plaintiff brought a civil antitrust action against numerous defendants alleging a conspiracy to establish minimum admission prices at Chicago movie theaters, but because the statute of limitations had been tolled for most but not all of the defendants, the damage period was considerably shorter for two of the joint defendants. The district court stated that because joint tortfeasors are jointly and severably liable, there can be no apportionment of damages between them. The court concluded that since a judgment against joint tortfeasors must be entered in a single sum against all defendants, it follows that there must be a damage period common to all. The court, therefore, held that if the plaintiff wished to hold in the two defendants for whom the statute of limitations had not been tolled, the damage period for all defendants would be limited to the shorter period applying to these two defendants.

■ Wilson argues that under *Essaness Theatres*, the damage period as to Cooper-Jarrett and Matlack in the present case would have been restricted to the time from which Wilson joined the existing conspiracy and, therefore, the settlement amount covers only those items of damages which provided the basis for the judgment against Wilson. This analysis would require the full settlement amount to be deducted from plaintiff's judgment. We decline, however, to apply the reasoning of *Essaness Theatres* to the present case. Unlike that case in which a judgment might have been entered against more than one defendant, the plaintiff in our case has obtained a judgment against a single defendant, Wilson Freight Company. The district court's concern in *Essaness Theatres*—that under Illinois law, separate executions in different amounts may not issue against joint tortfeasors who are bound by the same judgment—does not exist in the present case. Moreover, if Cooper-Jarrett and Matlack had elected to proceed to trial, it is not clear that their liability would have been limited to the period after Wilson had joined the conspiracy. The general rule appears to be that one who joins an on-going conspiracy is equally culpable with the original members and is responsible for all that has previously been done pursuant to the conspiracy. *See, e. g.,* United

3. We should note at this point that Wilson is not presenting a claim for contribution against its two alleged co-conspirators. In fact, this antitrust action is governed by federal common law under which there is no right of contribution for intentional torts. See Goldlawr, Inc. v. Shubert, 276 F.2d 614, 616 (3d Cir. 1960) ; Sabre Shipping Corp. v. American President Lines, Ltd., 298 F.Supp. 1339, 1343–46 (S.D.N.Y.1969). Unlike the federal securities laws the Sherman Act contains no provisions by which Congress has legislated an exception to this common law rule. See Sabre Shipping Corp., supra at 1345 ; 15 U.S.C. § 77k(f) ; 15 U.S.C. § 78i(e) ; 15 U.S.C. § 78r(b).

States v. Lester, 282 F.2d 750 (3d Cir. 1960), *cert. denied,* 364 U.S. 937, 81 S.Ct. 385, 5 L.Ed.2d 368 (1961); Lefco v. United States, 74 F.2d 66 (3d Cir. 1934); Ratner v. Scientific Resources Corp., 53 F.R.D. 325 (S.D.Fla.1971), *appeal dismissed,* 462 F.2d 616 (5th Cir. 1972); Rubenstein v. Columbia Pictures Corp., 154 F.Supp. 216 (D.Minn.1957); Walder v. Paramount Publix Corp., 132 F.Supp. 912 (S.D.N.Y.1955); 16 Am.Jur.2d, Conspiracy § 15 (1964). Wilson, therefore, may have been jointly liable for damages caused by the other two conspirators prior to its own entry into the existing conspiracy.

We find, however, that the settlement amount paid by Cooper-Jarrett and Matlack did include items of damages which were not part of the judgment against Wilson and, therefore, the defendant is not entitled to a deduction of the full settlement amount. At the close of all the evidence in the case, counsel met with the court in chambers to discuss the charge to the jury. With respect to the proper measure of damages, the defendant suggested that Wilson would be liable only for damages arising after it joined the conspiracy, rather than from the inception of the conspiracy, *and the plaintiff agreed to that instruction.* (Trans. No. 2 at p. 399). Accordingly, the court charged that if Wilson were found to have joined a conspiracy to blacklist the plaintiff, Wilson would be liable only for damages from the date on which it entered the conspiracy—August 24, 1971, the date when the plaintiff filed his application for employment. (Trans. No. 1 at p. 329). In this it may well be that Wilson got a better instruction than it was entitled to. Neither party, however, made timely objection to this instruction requested by Wilson and under Rule 51 of the Federal Rules of Civil Procedure, it may not now be assigned as error.

While the judgment against Wilson includes damages incurred only after August 24, 1971, the $60,000 settlement includes items of damages which arose before that date as well as after. The evidence in this case tended to show that Cooper-Jarrett had recruited Matlack in its efforts to blacklist the plaintiff prior to the time that Wilson joined the conspiracy. The *Zenith* rule prohibiting double recovery by a plaintiff, therefore, does not require the whole settlement amount to be deducted from the judgment. Only that portion of the settlement amount which covers items of damages arising after August 24, 1971 must be deducted from the judgment pursuant to the *Zenith* rule.

■ The first step in arriving at the appropriate portion of the settlement amount to be deducted from the judgment is to determine the total damages suffered by the plaintiff as a result of the conspiracy. Pursuant to the court's instructions, the jury found that the plaintiff incurred $25,000 in damages subsequent to August 24, 1971. We must, therefore, determine the amount of damages arising during the period between the inception of the conspiracy and August 24, 1971. Although Cooper-Jarrett may have intended to enlist other trucking companies to blacklist the plaintiff immediately after firing him on October 23, 1970, a conspiracy requires two or more parties. *See* Nelson Radio & Supply Co. v. Motorola, 200 F.2d 911 (5th Cir. 1952), *cert. denied,* 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953). Evidence in the record tends to show that the earliest date on which a conspiracy was in existence was February 1971, when the plaintiff applied for work at Matlack, but was turned down because "the word was out from Cooper-Jarrett". (Trans. No. 1 at p. 133; Trans. No. 2 at pp. 120, 222).

During the course of the trial both parties spent a considerable amount of time in an effort to show the proper measure of plaintiff's damages. The court permitted the plaintiff to introduce evidence of past earnings as an indication of what he might have earned if he had not been the target of the alleged conspiracy, and the defendant conducted an extensive cross-examination as to these earnings and introduced evidence

to mitigate the claimed damages. This evidence provides a sufficient basis for the court to determine damages arising between February 1971 and August 24, 1971—a period of about six months. Damages in a case such as this are seldom capable of precise determination, but the best evidence in the record of plaintiff's lost earnings between February 1971 and August 24, 1971 can be derived from the 1971 Wage and Tax Statement (Form W-2) of Richard Conley, another Cooper-Jarrett over-the-road truck driver with less seniority than the plaintiff, which was admitted into evidence as Plaintiff's Exhibit 11. (Trans. No. 1 at p. 127). This Form W-2 shows that Conley earned $17,963.-24 during 1971 which is approximately $1500 per month. Applying this measure of damages to the plaintiff, plaintiff's lost earnings would equal $9,000 over the six-month period in question.

In mitigation of these damages, we must subtract any wages earned by the plaintiff between February 1971 and August 24, 1971. The plaintiff testified that after being fired by Cooper-Jarrett on October 23, 1970, the first employment he found was with International Cold Storage Co. (Trans. No. 1 at pp. 62–63). The evidence further shows that the plaintiff worked for International Cold Storage from April 14, 1971 to December 6, 1971—a period of about eight months. (Trans. No. 1 at p. 88). Plaintiff's 1971 Individual Income Tax Return, admitted into evidence as Defendant's Exhibit D, reveals that the plaintiff earned $7,588.98 while working for International Cold Storage which is approximately $950 per month. During the period between February 1971 and August 24, 1971, the plaintiff worked approximately four months for International Cold Storage earning some $3800. When we subtract this amount from plaintiff's lost earnings of $9000, we arrive at net damages of $5200 for the period between the inception of the conspiracy and August 24, 1971. By adding this $5200 amount to the $25,000 damage figure which the jury found for the period after August 24, 1971, we conclude that the plaintiff suffered total damages of $30,200 as a result of the conspiracy.

Since the $60,000 payment by Cooper-Jarrett and Matlack was in settlement of all plaintiff's damages arising from the antitrust claim, once total damages are found the next step is to determine the percentage of these total damages which were incurred after August 24, 1971. This approach will give a fair indication of the percentage of the settlement amount which covered the same items providing the basis for the jury's verdict. By dividing the total damages into $25,000, we find that about 83 percent of the total damages were suffered after August 24, 1971, and 83 percent of the settlement amount equals $49,800. This amount constitutes double damages for which Wilson may present the defense of payment according to the *Zenith* rule. Under Flintkote Co. v. Lysfjord, 246 F. 2d 368 (9th Cir.), *cert. denied*, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957), the jury's verdict must be trebled before the appropriate amount of the settlement may be deducted. The judgment against Wilson, therefore, should be reduced from $75,000 to $25,200.

In conclusion, the plaintiff may recover only once for the same items of damages. Since the jury's verdict was based only on damages incurred after August 24, 1971, while the settlement amount covered damages suffered both before and after that date, Wilson is entitled to a deduction of only that portion of the settlement which covered damages after August 24, 1971. The plaintiff's argument that the jury found damages only against Wilson and that none of the settlement amount paid by its alleged co-conspirators may be deducted is not convincing. A conspiracy in violation of the Sherman Act requires two or more partes who become jointly and severably liable for the resulting damages. By finding for the plaintiff in this antitrust case, the jury by implica-

tion found that Wilson was not the only culpable party. An amount paid in settlement by one conspirator, therefore, may provide a defense of payment for a co-conspirator under the *Zenith* rule if it covers the same items of damages.