Harry **THERIAULT**, a/k/a Shiloh, a/k/a Bishop of Tellus

v.

Frederick **SILBER** et al.

No. EP–72–CA–212.

United States District Court,
W. D. Texas,
El Paso Division.

Feb. 13, 1978.

Harry W. Theriault, pro se.

Jamie C. Boyd, U. S. Atty., by Michael T. Milligan, Asst. U. S. Atty., El Paso, Tex., for defendants.

## MEMORANDUM OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN H. WOOD, Jr., District Judge.

The United States Court of Appeals for the Fifth Circuit has directed this Court to "conduct further proceedings on the present record and on such a supplemental record as it and the parties initially deem proper to make more explicit findings of fact and conclusions of law" on what basis the District Court concluded as a Finding of Fact that Theriault's beliefs do not constitute a religion. Also the Appellate Court instructed this Court to reconsider what constitutes a religion "by a thorough study of the existing case law as well as an appropriate evidentiary exploration of philosophical, theological and other related literature and resources on the issue", this being "just the sort of thing" that "should be ventilated first in the Trial Court".

Before proceeding to a consideration of the new material submitted by Mr. Harry W. Theriault, specifically that submitted on January 20, 1977, and before confronting the issue of what constitutes a religion, an examination of the record compiled during the seven months' period following the beginning of trial on August 20, 1974 would seem to be appropriate.

The El Paso case, EP–72–CA–212, commenced on August 17, 1972 and evidence was being received as late as March 18, 1975. During the period from commencement of trial on August 20, 1974 to the entry of Final Judgment on March 18, 1975 various extensive Open Court hearings were held as shown by a 311 page Transcript documenting the proceedings. This

Court received the Atlanta case, No. CA 13872, which had been ordered consolidated with the El Paso case, on March 17, 1975. The El Paso file, together with the records received from the Atlanta case, comprise two legal size cabinet drawers and consist of approximately 21 Volumes plus from eight to ten inches of other unfiled, but received papers. The record is made up of seven volumes of pleadings; one volume of plaintiff's exhibits; two volumes of defendants' exhibits; eleven volumes of Transcripts, mostly from the Atlanta case, and eight to ten inches of additional unfiled documents. Judgment was entered on March 18, 1975 dismissing this suit on the merits. Notice of appeal was filed on April 8, 1975. While this Court found then and still believes the monumental record in all of these consolidated cases demonstrates adequate ventilation of this "sort of thing", the Court of Appeals on April 29, 1977, over two years later, vacated the Judgment of this Court and remanded the case back for further "ventilation".

Using the nomenclature established by Judge Ainsworth in this very case styled *Harry W. Theriault v. Norman A. Carlson*, 495 F.2d 390, 1974, this would be labeled Theriault IV. In his Opinion in *Theriault v. Carlson*, supra, Judge Ainsworth outlined the history and the background of Harry W. Theriault and the organization called the "Church of the New Song". On June 18, 1970, in Theriault I, "Dr. Harry W. Theriault" and a fellow inmate, Rev. Jerry M. Dorrough, filed a First Amendment Action against the Catholic and Protestant Chaplains at Atlanta alleging various deprivations of their constitutional right to freely practice their religion. Dr. Theriault acquired his Doctor of Divinity Certificate through a mail order application. Theriault then, as the self-appointed Bishop of Tellus or Bishop of the Earth, ordained Dorrough First Revelation Minister of the "Church of the New Song" and conferred upon him in the Courtroom on the date of trial in 1970 the Decrees of Doctor of Divinity, Doctor of Philosophy and Bachelor of Philosophy. See *Theriault v. Carlson*, 495 F.2d 392 at Footnote 2.

After the Trial Court in Theriault I announced his intention to allow Theriault a "trial run" in holding his religious services at a final hearing in Atlanta held in January, 1972, several correctional officers and other prison officials from Marion, Illinois Penitentiary testified about various threats by Theriault of mass violence, veiled threats of murder, actual physical assault and battery of prison officers and destruction by Theriault of prison property. *Theriault v. Carlson*, supra, at page 392. One such incident occurred on April 1, 1971 following a request by Theriault to use the Chapel or Auditorium for the purpose of holding an organizational meeting:

"Theriault, an escape artist by his own admission, having several times broken away from Federal custody, was considered by prison officials to be a high escape risk. Moreover, he and his followers were known trouble makers. Theriault was told of the prison policy requiring permission from the Chaplain to secure a meeting place, and it was the Chaplain's duty to coordinate religious activities. Theriault declined to follow instructions and announced his intention to hold a meeting, *warning prison authorities that if they used violence to break it up there would be bloodshed.* Because of his threats, Theriault was placed in solitary confinement, to which he reacted by *kicking the correctional supervisor.* He later broke the bed from the cell wall, destroyed the toilet with a piece of angle iron, shoved the bed against the cell door and *warned that he would kill anyone who attempted to enter.*" (Emphasis supplied) *Theriault v. Carlson*, supra, at page 393.

Theriault II, this case, was filed subsequent to the Atlanta hearing after Theriault was transferred to the Federal Penitentiary at La Tuna, Texas. The Complaint filed by Theriault was dismissed forthwith by the District Court for the Western District of Texas by the Hon. Judge Ernest Guinn and Theriault appealed. Theriault III was filed in the District Court at Atlanta wherein Theriault alleged a failure to

comply with Judge Edenfield's ruling. A four day hearing was held in Atlanta resulting in a finding of contempt against Directors Carlson and Silber. See *Theriault v. Carlson* (Northern District of Georgia, 1973) 353 F.Supp. 1061. The Government appealed. On appeal Theriault III was overturned and the contempt finding was held to be an abuse of discretion and was reversed, annulled and set aside. See *Theriault v. Carlson*, 495 F.2d 390 (1974) at page 395. Theriault III was also vacated and remanded for a full evidentiary hearing and was consolidated with this case, Theriault II. After the hearings and compilation of the record as outlined above pursuant to the Order of the United States Court of Appeals for the Fifth Circuit in *Theriault v. Carlson*,[1] this Court, having inherited the case from the Hon. Judge Ernest A. Guinn at his death, dismissed the case with extensive and comprehensive accompanying Findings of Fact and Conclusions of Law. Approximately two years and one month later the case was vacated and remanded for "further ventilation . . . of appropriate evidentiary exploration of philosophical, theological and other related literature and resources", specifically referring to the materials submitted by Theriault to the Court of Appeals on January 20, 1977 which were filed in the District Court on July 8, 1977 as well as a copy of:

"The Living Gospel
Of
The New Song
for
the People of the Light"

"In Fulfillment of the Prophecy 'They sang a new song . . . for the healing of the nations.' "

"(Book of Revelation, 5:9 and 14:3 and 22:2)"

"An Inspired Text"

"THE PARATESTAMENT
in the New Language of the Church"

"CHURCH OF THE NEW SONG
Iowa City, Iowa 52240"

The Court has now considered these additional submissions of Harry W. Theriault as well as a number of religious encyclopedias such as the *Encyclopedia of Religion and Ethics*, James Hastings' edition, Volume 10 (Scrivener's Sons, 1951), the *Universal Jewish Encyclopedia*, the new *Catholic Encyclopedia* (Catholic University of America, 1967, the *Encyclopedia of Islam*, Lewis, et al. edition, E. J. Brill, 1965, as well as the King James version of the Holy Bible.

EXPLORATION OF PHILOSOPHICAL, THEOLOGICAL, AND OTHER RELATED LITERATURE AND RESOURCES

Before proceeding to an examination of the works of Harry W. Theriault, the Court will first examine the aforementioned resources and other materials with respect to the definition of religion. Implicit in such an examination is a study of what the religions say of themselves. Thus, each of the religious texts will, of course, take on the bias of its faith. The Judeo-Christian tradition, with which we are most familiar, recognizes the existence of a superior supernatural and all-powerful diety with a commensurate attitude of submission to that diety on the part of the practitioner or believer. Thus, a leading Protestant work, the *Encyclopedia of Religion and Ethics*, James Hastings Ed., Vol. 10, at page 675, states:

"It is true that there is in religion a characteristic submission (not necessarily an attitude of pacifity) to the supreme of the divine will—'Thy will be done.' "

This also refers to "dependence, prayer, sacrifice, necessity of moral behavior, etc" as important religious concepts. *Ibid* at page 678.

The *Universal Jewish Encyclopedia*, Volume 9, page 124, also points out this Supreme Being-creature relationship "of a creature overwhelmed by his nothingness in contrast to the overpowering, mysterious and supreme, Being". The text goes on to examine the origins of the term "religion" which originally was a latin word which Cicero explained as being derived from the latin verb "re-legre" which means to "care or practice", being the opposite of "neg-ligere" meaning "to neglect" and would thus

1. 495 F.2d 393 (1974).

entail "conscientiousness, scrupulousness, respect for what is sacred . . . devotion to the gods". *Ibid* at page 125. Other possible derivations are discussed in the same text. The Jewish Encyclopedia goes on to conclude that a religion will then develop into a community, congregation or church with a cult of ritual and ceremony, code of morality or standards of law and discipline for the group with a creed of beliefs with respect to God. *Ibid* at page 126.

*The New Catholic Encyclopedia* again reaffirms the concept of the Supreme Diety in religion in its concept of "the sacred". *New Catholic Encyclopedia*, Volume 12, at page 240. "Sacred" is explained as an "essentially ambivalent character which makes man feel that one is irresistably attracted by its grandeur and frightened by its superiority" *Ibid*, at page 241. Again, the attitude of dependence upon the "sacred" . . "a reality superior to man, a reality that is beyond the control of man's will and all of the forces of nature". *Ibid* at page 241. The *New Catholic Encyclopedia* goes on to discuss the topics of prayer, devotion, ritual, priesthood and other religious attitudes with respect to this sacred supreme reality.

The *Encyclopedia of Islam* distinguishes between *din* (religion) and *dawla* (government, politics) and sets forth that Moslems nevertheless believe that their religion is also a form of government. *Encyclopedia of Islam*, Lewis, et al. edition, E. J. Brill, 1965, Volume 2, Page 295. In the discussion of *din*, the *Encyclopedia of Islam* points out the following: "*Religio* evokes primarily that which binds man to God; and *din*, the obligations which God imposes upon His 'reasoning creatures'. Now, the first of these obligations is to submit to God and surrender oneself to Him since the definition or the etymological sense of *Islam* is 'the surrender of self (to God), . . .'"

The concept of the Supreme Being, Supreme Diety or Supreme reality is the most familiar and perhaps easiest to understand for those of us in the Judeo Christian tradition. The preeminence of this concept and understanding of religion is of considerable historic significance in the United States. The Declaration of Independence stated:

"We hold these truths to be self-evident, *that all men are created equal, that they are endowed by their Creator* with certain unalienable Rights, that among these are Life, Liberty and the Pursuit of Happiness. That to secure these rights, Governments are instituted among Men deriving their just powers from the consent of the governed." *Declaration of Independence*, U.S.C.A. Constitution, Article I, Section 1 to Section 8, Clause 3, at Page 2.

While this belief in a Supreme Being or Creator may be pervasive in our society, this belief cannot be sustained as a distinguishing characteristic of religion. In *United States v. Seeger*, 380 U.S. 163, 85 S.Ct. 850, 865, 13 L.Ed.2d 733 (1965), Mr. Justice Douglas in his Concurring Opinion in that case pointed out the insufficiency of a belief in a Supreme Being and a concept of a personal God in the writings of Hinduism and Buddhism.

In examining the materials submitted by Harry W. Theriault to the Appellate Court, it is important to note in Mr. Theriault's writings which he entitles "The Paratestament" or "The Living Gospel of the New Song" that Mr. Theriault does not simply allege to hold a concept of a Supreme Being or Diety nor the vaguer concepts of reality or God as outlined by Hinduism and Buddhism, but rather claims to be Jesus Christ. In his Paratestament, Chapter 7, Versus 6 through 52, note particularly Verse 9:

"So they began to call me Jesus; and my fame spread with this name, and reached King Herod's ears; and his soldiers were after me, and so were Governor Pilate's publicans, and especially the high priest of Palestine."

Verse 11 then states:

"After this, I had gone throughout the whole territory of the Jordan river preaching; *Repent, and you are forgiven.*"

Verse 45 states:

"I remember saying, *Eli, Eli, lama sabachthani.*" (These are the words of Jesus Christ as he died on the Cross as recorded in the New Testament.)

## EXISTING CASE LAW

As indicated above, the threshold issue before this Court to decide is "whether the beliefs professed by [petitioners] . . . are sincerely held and whether they are, in [their] own scheme of things, religious." See *United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 863, 13 L.Ed.2d 733 as cited by the Fifth Circuit Court of Appeals in Theriault I and II.[2] In the *Seeger* case, involving conscientious objections to war and violence, the test of what was meant by "religious training and belief so as to embrace all religions and to exclude essentially political, sociological or philosophical views" (*Seeger*, supra, at page 165, 85 S.Ct. at page 854) was whether such "belief that is sincere and *meaningful* occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God". (*Seeger*, supra, at page 166, 85 S.Ct. at page 854).

It should be noted that in the conscientious objector cases the beliefs held by petitioners were in opposition to violence and war in contrast to the violence and destructiveness of plaintiff in this case.

In view of the "long list of court actions to which [petitioner] is a party, some of which are still pending, as well as the lengthy prison record which he has established over the years," this Court will employ "sharp and careful scrutiny of his activities, including his claim of religious sincerity." See Theriault I and II, 5th Cir. 1974, 495 F.2d at page 394. For, as reiterated by the Fifth Circuit in Theriault I and II, supra, at page 394, "First Amendment freedoms are not absolute. They are properly restricted when a sufficiently important governmental interest appears. *United States v. O'Brian*, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 . . . ."

Further, this Court recognizes, as does the Fifth Circuit in Theriault I and II, supra, at p. 395, the difficulty in establishing satisfactory and precise standards by which to judge the bona fides of petitioner's alleged religion. Whatever the difficulties are, they do not, by their existence, obviate the necessity of deciding the issue nor do they provide an impenetrable obstacle "to denials of First Amendment protection to so-called religions which tend to mock established institutions and are obviously shams and absurdities and whose members are patently devoid of religious sincerity. . . . ." Theriault I and II, supra, at p. 395.

Several facts developed during the proceedings had at Atlanta in the case of *Theriault v. Carlson*, 339 F.Supp. 375, and succinctly restated by the Fifth Circuit in Theriault I and II,[3] are relevant to this Court's consideration herein. Among these are:

1. That "the Eclatarian faith, or Church of the New Song, was originally founded by Theriault and Jerry M. Dorrough at the federal penitentiary at Atlanta, Georgia, allegedly as the result of visions experienced by Theriault at the Marion, Illinois federal penitentiary in which he received prophetic messages from 'Eclat' informing him that he was the 'Eclatarian Nazarite' and directing him to establish the Church of the New Song." Theriault I and II, supra, footnote 1, p. 391;

2. That "Theriault acquired his Doctor of Divinity certificate through a mail order application. Theriault then, as self-appointed 'Bishop of Tellus' ordained Dorrough First Revelation Minister of the Church of the New Song . . . ", supra, footnote 2, p. 392;

3. That when Theriault "and Dorrough decided to file his complaint [in the U.S. District Court for the Northern District of Georgia, *Theriault, et al v. Carlson, et al.,* supra] they needed the proper caption. Dorrough came forward with this suggestion which they adopted: 'you put yourself down, you be the head of the church, that's the Bishop, you put yours, and put me

---

2. See supra, (495 F.2d at p. 395).

3. Supra at p. 391, Footnote 1.

down as the First Minister," supra, footnote 3, p. 392;

4. That the "Eclatarian faithful, aside from one secretary, are to be found only in the federal penitentiaries of Atlanta and Marion." Theriault, 339 F.Supp. 375, 377 n. 3. Of course, now the federal penitentiary at La Tuna, Texas can be added to the list as the petitioner Theriault is now incarcerated there;

5. That "at the final hearing at Atlanta held in January, 1972, several correctional officers and other prison officials from the Marion, Illinois penitentiary testified about various threats by Theriault of mass violence, veiled threats of murder, actual physical assault and battery of prison officials, and destruction by Theriault of prison property." Theriault I and II, supra, 495 F.2d at p. 392;

6. To this incomplete, but representative, list of relevant factors can be added Theriault's conviction before this Court by a Jury of assault on federal officers and destruction of government property arising out of an incident occurring during Theriault's transfer to the Federal Penitentiary at La Tuna, Texas, during which Theriault, handcuffed and confined by legirons, vaulted over the back seat of the government vehicle in which he was being transported by federal officers and, by jamming his feet through the steering wheel of the vehicle, caused it to proceed out of control and overturn injuring the federal officers so transporting him;

7. That Harry W. Theriault claims to be, among other things, the second Messiah, the Bishop of Earth (Tellus) (See generally Paratestament, *Theriault*) supra; and

8. That in the document submitted by Harry W. Theriault he claims that he would have established a new World order by 1976.

The Court has examined all of the documents, testimony and records made of record in the instant case together with the evidence presented at the various hearings had herein and the arguments of all parties and finds the petitioner's contentions to be lacking.

■ The Church of the New Song appears not to be a religion, but rather as a masquerade designed to obtain First Amendment protection for acts which otherwise would be unlawful and/or reasonably disallowed by the various prison authorities but for the attempts which have been and are being made to classify them as "religious" and, therefore, presumably protected by the First Amendment.

Rather than urging upon its followers any particular theology or philosophy of life, the Church of the New Song appears to encourage a relatively non-structured and free-form, do-as-you-please philosophy, the sole purpose of which is to cause or encourage disruption of established prison discipline for the sake of disruption. Disruption of and/or problems for prison authorities is not the *result* of this so-called religion; it is rather the underlying *purpose* of it. For example, the "Church's" one attempt at a paschal type feast produced a tongue-in-cheek request for prison authorities to supply steak and wine. Further, as Warden Rigsby has testified, the services which petitioner's followers were allowed to hold at the Atlanta penitentiary were nothing more than "gripe sessions" designed to attempt to gain advantages over other inmates not belonging to the "group" and were totally lacking in anything approaching religious content.

Petitioner and his cohorts have formed an organization whose purpose is to improve the position of member prison inmates vis-a-vis the prison administrations. To obtain leverage for the organization and to enable it to operate more freely within the Federal Penitentiaries, petitioner has Christened it a "religion" and endowed it with the trappings thereof. Thus, it is that the unmistakable stench of the skunk is found eminating from that which petitioner has declared a rose.

The Fifth Circuit has held that some standards must be applied to determine the legitimacy and validity of a "religion" and has recommended that such standards be applied with sharp and careful scrutiny to petitioner's "Church of the New Song". The exclusively political and non-religious nature of the doctrine of the "Church of the New Song" as that doctrine has developed in the writings of the petitioner over the past three years, together with the violent and raucous tone of its services at the Atlanta Penitentiary, indicate that the "Church" has totally failed the "trial run" test which it received in the Northern District of Georgia three years ago.

The professed belief of Mr. Theriault that he is the second Messiah (Paratestament, Theriault, Chap. 7, V.1–114) appears to this Court to be insincere and, like the rest of the actions of the petitioner, are "essentially political, sociological and philosophical". The professed views of Mr. Theriault that he "would have established a new World order" with Harry W. Theriault as the head of the Order (see generally Paratestament, Theriault) supra are, in the opinion of the Court, more closely akin to the megalomania of Adolph Hitler and the Nazis or Charles Manson and his "family" than any "belief . . . that 'occupies a place' parallel to that filled by the orthodox belief in God".

The First Amendment to the United States Constitution states that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof". In interpreting this Amendment, the Courts have recognized with respect to prisoners' religious freedom that:

"Although the law acknowledges a prisoner's 'forum of conscience' deserving of protection, *Remmers v. Brewer*, 494 F.2d 1277 (8th Cir., 1974) it also recognizes that *a person, in or out of prison, may not, in the name of religion, become a law unto himself.* As we said in *Evans v. Ciccone*, [377 F.2d 4 (8th Cir. 1967)]; 'Freedom of religion can never mean . . . freedom to flagrantly disregard

reasonable rules of conduct in or out of prison'. 377 F.2d at 6." (Emphasis supplied.) *Proffitt v. Ciccone*, 506 F.2d 1020 (1974).

" 'It has never been held that upon entering a prison one is entirely bereft of all his civil rights and forfeits every protection of the law.' " *Sewell v. Pegelow*, 291 F.2d 196, 198 (4 Cir., 1961). See also *Pierce v. La Vallee*, 293 F.2d 233 (2 Cir. 1961).

This statement was cited with approval in the case of *Brown v. Peyton*, 437 F.2d 1228 (4th Cir., 1971). Judge Winter, writing for the majority of the Three Judge Panel and also citing *Cooper v. Pate*, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964) went on to affirm:

"These cases clearly establish that a prisoner does not shed his first amendment rights at the prison portals."

In *Brown*, the majority pointed out that:

"While first amendment rights are 'preferred' rights, nonetheless, they are not unlimited. The state may restrict religious acts if it can be shown that they pose 'some substantial threat to public safety, peace or order,' and that there is a 'compelling state interest in the * * * regulation.' *Sherbert v. Verner*, 374 U.S. 398, 403, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963)."

Judge Winter pointed out certain State interests upon which prison authorities may justify repression or restriction of First Amendment rights of prisoners. They included:

1. Prison officials have to confine dangerous men in unpleasant circumstances.

2. They must protect the public at large, prison employees and also other prisoners, who are almost totally dependent on the prison for their well being.

3. Prison authorities have a legitimate interest in the rehabilitation of prisoners.

4. The State has an interest in reducing the burden and expense of administration.

The majority in *Brown* also noted that "many restrictions on first amendment rights are undoubtedly justifiable as part of

the punitive regimen of a prison: confinement itself, for example, prevents unlimited communication with the outside world but is permissible in order to punish and deter crime; . . . " *Brown*, supra, at page 1231.

The Court in *Brown* held that the "burden of proving [paramount state interests] rests on the state". This Court agrees.

Turning to the case at Bar. The petitioner, Harry W. Theriault, is apparently requesting (assuming that his political activities are entitled to the status of a religion) the following relief:

1. To form a seminary to train his ministers. (R. Vol. VI Tr. 1, 11–70–71, pp. 145–146)

2. To preach the "Eclatarian Demandate of Natural Rights", including the right to pursue happiness. (Id. pp. 147–148)

3. To wear a beard because of the awe and respect that it inspires in his followers. (Id. pp. 149–150)

4. The right to correspond with such figures as Jane Fonda, Lewis Wolfson, Sam Bataglia and Felix Alderisio (the last two individuals alleged to be Mafia figures in the Government's brief) as well as his fellow prisoners, all for the purpose of soliciting financial contributions. (Id., pp. 151–165)

5. The right to hold meetings where he presides upon short notice without approval of prison authorities. Theriault stated that he demanded in one instance immediate access to the Chapel at La Tuna and when his demand was not met he broke down the door of the chapel. (Id., pp. 50–54)

6. The record is replete with the actions of Mr. Theriault which indicate to this Court that Mr. Theriault wants all the privileges of a chaplain rather than an inmate of the institution wherein he resides.

As was stated by Judge J. Marshall in *Hundley v. Sieloff,* 407 F.Supp. 543, 545 (1975) in another case involving Mr. Theriault's organization:

"In *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (per curiam), the court, in considering the claims of a Buddhist prisoner who claimed he was punished for practicing his religion, stated that not

'every religious sect or group within a prison—however few in number—must have identical facilities or personnel. A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand. But reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of penalty.' 405 U.S. at 322, n. 2, 92 S.Ct. at 1081.

"Mr. Chief Justice Burger, concurring, stated further that,

'There cannot possibly be any constitutional or legal requirement that the government provide materials for every religion and sect practiced in this diverse country. At most, Buddhist materials cannot be denied to prisoners if someone offers to supply them.' 405 U.S. at 323, 92 S.Ct. at 1082."

In conformity with *Cruz*, supra, it appears to this Court that Petitioner's demand for seminary facilities, the right to exercise unfettered authority over the prison chapel, and the right to all of the privileges of a prison chaplain should be, and the same are hereby, in all things DENIED in light of the compelling State interests heretofore enumerated. Even if the so-called "Church of the New Song" is in fact a religion (which it obviously is not), reasonable and necessary restraints and regulations may be imposed by the penal institution on all of its inmates. To give a prisoner who is an admitted escape artist and who has been convicted of assault and battery on corrections officers the unrestricted freedom which he demands would make a mockery of the corrections system and would afford him privileges not available to other inmates, unless they joined his union.

Reasonable State prison regulations as to personal hygiene and grooming have long been upheld in this Circuit. See *Brooks v. Wainwright,* 428 F.2d 652 (5th Cir., 1970). Such regulations have been sustained in other Circuits as well. See e. g. *Proffitt v. Ciccone,* 506 F.2d 1020 (8th Cir., 1974); *Rinehart v. Brewer,* 491 F.2d 705 (8th Cir., 1974) (Lay, J., dissenting).

The general rule is that Courts should not interfere in the internal management or functions of State prisons. In the recent case of *Hill v. Estelle,* 537 F.2d 214 (5th Cir., 1976) the Fifth Circuit upheld the decision in *Brooks* in a per curiam opinion:

"In *Brooks* we stated that haircut and shaving regulations in a state prison did not violate the inmates' free exercise of religion, freedom of expression, or due process of law." *Hill,* supra, at p. 215.

This Court agrees with the rationale of Hill and under the separation of powers would not interfere with the duty of the Executive Branch to administer the prisons "where prisoner regulations are neither unreasonable nor arbitrary" with respect to hair length or beards. *Hill,* supra, 537 F.2d at p. 215. See also *Williams v. Hoyt,* 556 F.2d 1336 at 1339 (5th Cir., 1977). Accordingly, petitioner's demand for the right to grow his beard is hereby DENIED.

The denial of Petitioner's demand to espouse in prison his particular creed of the "Eclatarian Demandate of Natural Rights" cannot be held by this Court to be an unconstitutional abridgment of the First Amendment. Where dangerous felons are involved it has been held that even the refusal of prison authorities to allow a high-risk prisoner to attend chapel, much less the right to "preach" to fellow inmates, is not a denial of First Amendment rights. *Sharp v. Sigler,* 408 F.2d 966 (8th Cir., 1960). The Court stated in *Sharp v. Sigler* at page 970:

"While freedom to believe is absolute, the exercise of religion is not."

It has also been held that:

" 'Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices.' *Reynolds v. United States,* 98 U.S. 145, 166, 25 L.Ed. 244 (1879)."

The "gospel" Mr. Theriault espouses proclaims a new World Order with a new "bishop of the earth"—Harry W. Theriault. (See generally Paratestament, *Theriault*) supra. Mr. Theriault has been convicted of escape involving assault of federal officers. *Theriault v. United States,* 409 F.2d 1313 (5th Cir., 1969) (reversed as result of change in insanity law while case pending appeal) wherein Mr. Theriault leaped from the back seat of a Deputy Marshal's car, obtained the Marshal's gun, thereby gaining control over the Marshals and then abandoned the Marshals in the country chained to a tree. Except for the resourcefulness of the Marshals, Mr. Theriault's actions could have resulted in their deaths. Mr. Theriault has been found guilty of escape and assault in another case involving quite similar circumstances. See *United States v. Theriault,* 531 F.2d 281 (5th Cir., 1976). Theriault again leaped from the back seat of a Marshal's car causing the wreck of the government automobile and injuring both Marshals. Apparently, at least four United States Deputy Marshals have come near death due to the violent actions of the Petitioner. The Appellate Court in the second escape case noted the prior contempt convictions of the Petitioner in upholding the Trial Judge's refusal to remove Petitioner's shackles during Courtroom proceedings. The contemptuous acts on the part of Theriault "included the use of foul language and calling a witness a liar, and we noted a communication from appellant (petitioner herein) to the trial judge that threatened 'another Attica' escape and bloodshed". 531 F.2d at 284. The dangerous propensities of the petitioner toward assault and violence have been established on numerous occasions.

This Court finds that to allow petitioner to preach his "Doctrine" of violence, bloodshed, and rebellion against authorities and to correspond with whomever he desires without proper surveillance would constitute "a clear and present danger of a breach of prison security or discipline or

some other substantial interference with the orderly function of the institution". *Knuckles v. Prasse*, 435 F.2d 1255, 1256; *Long v. Parker*, 3rd Cir., 390 F.2d 816, 820, 822.

Accordingly, Petitioner's claims for relief in his First Amendment action and subsequent pleadings, whether or not his beliefs constitute a "religion", are hereby in all things DENIED.

Therefore, having considered the entire record in all of these consolidated cases, the arguments of counsel and the applicable law, including a thorough exploration and study of "philosophical, theological, and other related additional literature and resources on the issue" of religion, vel non, and having once again further "ventilated this sort of thing", practically to the point of hyperventilation, the Court makes the following "more explicit" additional Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. Early in 1971, while incarcerated at the Federal Penitentiary at Atlanta, Georgia, petitioner, Harry W. Theriault, and Jerry M. Dorrough formed an organization among their fellow prisoners and denominated it the "Church of the New Song". Over the past five years the organization has met with some small success within State and Federal prisons, but has been of negligible appeal outside of prison.

2. Petitioner contends without dispute and the Court so finds that he is the leader and head of the "Church of the New Song". His pronouncements on the tenets, beliefs, ideas, practices and general principles of the "Church of the New Song" are thus authoritative of the official position of the "Church of the New Song".

3. Petitioner has committed various and numerous infractions of prison rules during his stay at the Federal Correctional Institution at La Tuna, Texas beginning in March of 1972.

4. The beliefs professed by the petitioner are not sincerely held and do not in their own scheme of things constitute a "reli-gion" nor are they sincerely of a "religious" character.

5. The so-called "Church of the New Song" does not meet the criteria adopted by this Court in its analysis above to entitle it to First Amendment protection as a religion. It is clearly a sham designed and calculated to obtain favored treatment for its members incarcerated in various prisons and has no measurable following outside Federal Penitentiaries.

6. There is no evidence of probative force to substantiate plaintiff's claims that defendants violated the "establishment of religion" clause of the First Amendment in their provision of religious services to the inmates at Federal prisons.

7. There is no evidence of probative force that defendants or anyone acting for them or under their authority or control illegally reported anything to anyone in any way concerning any of petitioner's activities or that defendants in any manner improperly or illegally interfered with or impeded the petitioner or his followers in attempting to establish or practice a "religion".

8. That the claim of Mr. Theriault to be the second Messiah is merely a front for what is essentially a political "union" or organization with primary goals of establishing a unit to bargain with prison officials and ultimately to establish a new social order based on "votaries" with Harry W. Theriault as its head.

9. While an inmate does not forfeit all of his rights under the Constitution, he does lose some of them such as the most valued one, i. e. the right to his freedom. Thus, he is by necessity subject to reasonable and necessary disciplinary rules, regulations and measures, including those imposed by the penal institution in this very case.

10. The Court adopts, reaffirms and incorporates herein, and finds even more applicable now, all of the Findings of Fact and Conclusions of Law that were made in his earlier decision and Judgment filed in this case. (See 391 F.Supp. 678).

## CONCLUSIONS OF LAW

1. Any restraints and/or disciplinary measures invoked against petitioner by defendants resulted from his various infractions of prison rules and not out of retaliation for or in response to any legitimate religious activities. Even if under any conceivable theory the so-called "Church of the New Song" is in fact a religion, such restraints and disciplinary measures imposed by the institution were of reasonable and necessary nature under the circumstances.

2. The "Church of the New Song" is not a religion within the scope of the First Amendment.

3. Not being a religion within the scope of the First Amendment, the "Church of the New Song" is not entitled to First Amendment protection claimed by the petitioner.

4. Having fully again "ventilated" the alleged religious claims of petitioner, the relief sought by him is in all respects DENIED.